IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FRANCISCO J. REYES,                        )
                                           )
            Plaintiff,                     )
                                           )
      vs.                                  )     Civil Action No. 07-CV-2193-KHV/GLR
                                           )
BOARD OF COUNTY COMMISSIONERS              )
OF SEDGWICK COUNTY, KANSAS;                )
GARY STEED, SEDGWICK COUNTY                )
SHERIFF; ROBERT HINSHAW,                   )
SEDGWICK COUNTY UNDERSHERIFF;              )
JOHN DOE; JAMES ROE; and SAM SMITH,        )
                                           )
            Defendants.                    )
_____)

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff alleges a Federal Civil Rights, 42 U.S.C. § 1983 claim and common law claims for negligence and false imprisonment stemming from his misidentification and two week detention in the Sedgwick County Detention Facility.  Defendants request summary judgement on all three claims.

Plaintiff was arrested in Arapahoe County, Colorado on a facially valid warrant out of Sedgwick County, Kansas for the rape of a child.  Plaintiff was arrested because his forename, middle initial and surname matched the Kansas warrant, because his Kansas I.D. number, social security number and date of birth matched those linked to the fugitive, and because he possessed physical characteristics (including a scar on the right forearm) similar to the fugitive.

1

Following his arrest, plaintiff promptly appeared in Arapahoe County District Court, at which time he waived extradition and failed to allege mistaken identity to either the court or his public defender.  Plaintiff was subsequently transported back to Sedgwick County and within twenty four hours made his first appearance in district court, where he again failed to allege mistaken identity. When plaintiff's counsel did finally bring the mistaken identity to the attention of the District Attorney, plaintiff was released that same day.

Plaintiff's § 1983 claim alleges these defendants failed to conduct a post-arrest investigation that would have sooner uncovered the mistaken identification by Colorado law enforcement.  The § 1983 claim fails because there is no clearly established constitutional right to a post-arrest investigation.  Alternatively, if this court identifies a clearly established constitutional violation, these defendants are not liable for the same.  Plaintiff's common law claims of negligence and false imprisonment fail because they lack the requisite elements and because defendants enjoy governmental immunity in their discretionary functions.

## STATEMENT OF UNCONTROVERTED FACTS

For purposes of this motion only, defendants set forth the following facts:

**PLAINTIFF'S ARREST BY COLORADO STATE TROOPER**

1.      On Friday, November 18, 2005, Phillip Gallegos, a Colorado State Trooper, stopped plaintiff Francisco J. Reyes (hereinafter "plaintiff") for speeding through a construction zone in Arapahoe County, Colorado.   (Ex. A, Deposition excerpts of Phillip Gallegos, pp. 6:16-8:1)

2.      At the time of the traffic stop, plaintiff did not possess a valid driver's license.  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 199:17-200:19)

3.      However, plaintiff did provide the trooper a Kansas Identification Card.  (Ex. A, Deposition excerpts of Phillip Gallegos, pp. 7:20-8:8; 15:25-16:5)

4.      The Kansas Identification Card, No. K00951769, identified plaintiff as "Francisco

J. Reyes," with a date of birth October 10, 1972. (Ex. A, Deposition excerpts of Phillip Gallegos, pp. 14:16-15:10; Ex. B, Affidavit of Phillip Gallegos, ¶ 5)

5.     While plaintiff Reyes was stopped on the side of the road, the trooper contacted the Colorado State Patrol Dispatch Center via radio to check for outstanding warrants on a "Francisco J. Reyes," DOB October 10, 1972 and Kansas ID Card. No. K00951769. (Ex. A, Deposition excerpts of Phillip Gallegos, pp. 8:9-14; Ex. B, Affidavit of Phillip Gallegos, ¶ 6)

6.     The trooper was informed by dispatch there was an outstanding warrant on the charge of rape from Sedgwick County, Kansas for a "Francisco J. Reyes" with the exact same Kansas Identification Card No. K00951769 as plaintiff and plaintiff's October 10, 1972 birth date matched one of the several birth dates used by the fugitive. (Ex. A, Deposition excerpts of Phillip Gallegos, pp. 8:9-18; 15:6-24; 16:6-23; Ex. B, Affidavit of Phillip Gallegos, ¶ 7)

7.     The trooper also checked and found plaintiff had a scar on his right arm, which matched one of the identifying descriptors of the fugitive. (Ex. A, Deposition excerpts of Phillip Gallegos, pp. 11:4-13)

8.     The trooper arrested plaintiff on the outstanding warrant and transported him to the Arapahoe County Detention Facility (hereinafter "ACDF"). (Ex. A, Deposition excerpts of Phillip Gallegos, pp. 10:2-10:9; 12:8-17; 13:9-12; Ex. B, Affidavit of Phillip Gallegos, ¶ 8)

9.     Upon arrival at the ACDF, the Receiving Deputy confirmed plaintiff had the same forename, middle initial, and surname as detailed in the warrant, that plaintiff's birth date was one of the alias birth dates employed by the fugitive, and that plaintiff's Kansas identification number and social security number were exact matches to numbers linked to the fugitive. (Ex. D, Affidavit Of Nesvold, ¶¶ 7-14; Ex. F, Kansas Identification Card of Plaintiff; Ex. G, Booking Report of Plaintiff;  Ex. E, NCIC Warrant Teletype dated November 18, 2005)

**COMPLETION OF PAPERWORK AND EXTRADITION HEARING IN COLORADO**

10.     On November 21, 2005, a senior clerk at the ACSO Fugitive Transport Section contacted the Sedgwick County Sheriff's Office in Wichita, Kansas and ordered a copy of the warrant.  Sedgwick County Sheriff Deputy Westbrook faxed the clerk a copy of the warrant on that same day.  *(See* Ex. H, Affidavit of Diane Shouse, ¶ 8; Ex. I, Fax from Sedgwick County Sheriff's Office to Diane Shouse, with attached warrant)

11.     The clerk compared the information provided for the fugitive with the information of plaintiff and again confirmed matching forename, middle initial, and surname, date of birth and social security number.  (Ex. H, Affidavit of Diane Shouse, ¶¶ 9-12)

12.     Satisfied that the person in the custody of the ACSO was the fugitive identified in the Kansas warrant, the clerk completed the fugitive case and sent it to the DA's Office for the

advisement of the Defendant (plaintiff Reyes here) on the charge of Fugitive from Justice. (Ex. H, Affidavit of Diane Shouse, ¶ 13, 14)

13.     On November 22, plaintiff appeared in Arapahoe County District Court with his public defender.  The public defender tendered a copy of the written Advisement of Rights to the court, signed by plaintiff, wherein plaintiff acknowledged he read and understood the charges and his rights in this matter.  (Ex. J, Affidavit of Stephen Fauver, ¶ 9; Ex. K, Advisement of Rights)

14.     During that hearing, the public defender advised the plaintiff was voluntarily waiving extradition to Kansas and tendered the written Waiver of Extradition, signed by plaintiff, to the court. (Ex. J, Affidavit of Stephen Fauver, ¶ 10; Ex. L, Waiver of Extradition)

15.     At no time did plaintiff or his public defender make any representation on the record before Arapahoe County Court Judge Chauche, or to the Deputy DA, that the person appearing in custody was not the person identified in the warrant. (Ex. J, Affidavit of Stephen Fauver, ¶ 11; Ex. M, Plaintiff's Response to Request for Admission No. 4 of Defendants' Discovery Requests signed by Reyes on August 14, 2007; Ex. N, Transcript of Electronically Recorded Proceedings on November 22, 2005; Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 118:6-119:17)

16.     Further, plaintiff even failed to inform his public defender that he was not the person named in the warrant, but simply stated he wanted to waive extradition to Kansas.  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 113:25-117:11; 182:6-183:5)

17.     Later that day, the clerk in Arapahoe County  notified the Sedgwick County Sheriff's Office that plaintiff had signed a Voluntary Waiver of Extradition and was ready for transport. (Ex. H, Affidavit of Diane Shouse, ¶ 16)

18.     It is the policy of Sedgwick County Sheriff's Office to forward fingerprints and mug shots of fugitives to the arresting jurisdiction if the arrestee denies being the person named in the warrant, or if the arresting jurisdiction requests them. (Ex. P, Investigation report of Major Hinshaw, p. 5, Ex. O, Deposition excerpts of Major Robert Hinshaw, pp. 54:14-21, 117:25-119:13)

19.     Sedgwick County did not send the mug shots or fingerprints to Arapahoe County because Arapahoe County did not request the documents and because Sedgwick County had been informed that plaintiff was waiving extradition, which the Sheriff's Office interpreted to mean that plaintiff had confirmed he was the person named in the warrant. (Ex. O, Deposition excerpts of Major Robert Hinshaw, pp. 54:11-21)

**EXTRADITION TO AND BOOKING OF PLAINTIFF IN SEDGWICK COUNTY**

20.     On December 1, 2005, plaintiff was transported to Sedgwick County, Kansas. (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 124:6-15)

21.     During his flight from Colorado to Sedgwick County, plaintiff did not complain of mistaken identity to the transporting deputies.  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 219:19-23)

22.     With regard to whether plaintiff ever informed any Sedgwick County official about the mistaken identity, plaintiff testified to only one conversation, which occurred during the booking process.  Plaintiff's testimony in this regard is as follows:

> Q.  As to any of the folks that you talked to then, that we've just gone through, did you tell them that "you got the wrong guy; I'm not the correct Francisco Reyes"?
>
> A.  Yes.  The finger -- The ones that did my fingerprints, I told them I am not this guy.
>
> Q.  What did they say?
>
> A.  They said, "Well, the faster we get this done, the faster you go to population."  And I told them, you know, I told them I didn't want to sign that.  They said, well, that was going to wait a little longer to get -- you know, to go in, and I wanted to go get a bed because I was sleeping on the floor at the holding tank, what they call it, the holding cell.  So I went ahead and signed it just to get a cell.
>
> Q.  And what you didn't want to sign was a document that showed, well, something like Exhibit 34, the Rayes, R-a-y-e-s, name, is that why you didn't want to sign the document?
>
> A.  I believe it had something else.
>
> Q.  Looking at Exhibit 22, which is another FBI card, although this one, I think the testimony is, was prepared before then.  But was it like this that you're talking about that you didn't want to sign it because it talked about the Rayes information?
>
> A.  It was different than this.  It was just a card, it was like a cardboard card, where you just

sign your name, and it had other prior information,
and it said I was from Mexico.  So that's why I didn't
want to sign it.

Q.  So it had some aliases that you'd never
used and it said you were from Mexico and you weren't
from Mexico?

A.  Yeah.

Q.  So you said to this guy, "I don't want to
sign it" because of those things?

A.  Yeah.  I told him I was from Nicaragua.

Q.  And he said, "Well, sign it now, it's
faster, and you can deal with it later"?

A.  Yeah.  He said if Nicaragua was part of
Mexico, if it was a city in Mexico.  So at that point
moment I just, you know, stopped talking to him.

Q.  He didn't show a great deal of knowledge
about geography, I take it.

A.  He didn't know where Nicaragua was.

(Ex. C, Deposition excerpts of Plaintiff Reyes, p. 226:11-228:6)

        23.    Plaintiff admits he did not allege mistaken identity to any of the other officers
involved in his processing.  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 231:7-233:17)

        24.    The fugitive's fingerprints were not immediately available, electronically or in hard
copy, to detention staff on the date of plaintiff's processing, but rather had to be retrieved from the
file of the original WPD detective handling the rape case.  (Ex. P, Investigation report of Major
Hinshaw, p. 4, Ex. X, Deposition excerpts of Sgt. Nelson, pp. 9:8-10:19)

        25.    At the time of plaintiff's processing, the Sheriff's Office did not have an employee
who was qualified to compare and interpret fingerprints. (Ex. X, Deposition excerpts of Sgt. Nelson,
pp. 88:16-20)

        26.    The mug shot that existed for the fugitive was taken prior to the County's use of
digital photography and was not viewable by detention staff on the county's computer system at the

6

time of plaintiff's processing.   (Ex. P, Investigation report of Major Hinshaw, p. 5)

27.     The Sheriff's Office had written policy in place at the time of this incident to confirm the identity of those persons being processed.  The written policy required that if there exists any doubt as to identity, the deputy is to notify the Booking Sergeant.  Further, in the event an inmate's identity could not be immediately verified, the records section was to be notified and fingerprints were to be taken in attempt to make a positive identification.  (Ex. V, General Order 103.02, Ex. W, General Order 107.00)

28.     In addition to written policy, the unwritten policy and deputy training requires they take reasonable measures to verify the correct person is in custody.  (Ex. O, Deposition excerpts of Major Robert Hinshaw, pp. 76:2- 77:4; 12:12-13:12; Ex. X, Deposition excerpts of Sgt. Nelson, pp. 47:18-24; Ex. P, Investigation report of Major Hinshaw, p. 5-6)

## PLAINTIFF'S FIRST APPEARANCE IN SEDGWICK COUNTY

29.     On December 2, 2005 at approximately 1:40 p.m. (twenty-four hours after his booking in Sedgwick County), plaintiff made his first appearance in Sedgwick County District Court. (Ex. Q, SCDF Inmate log)

30.     At no time during his first appearance did plaintiff protest his innocence or allege mistaken identity to either the court or the D.A.  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 188:6-189:1)

## PLAINTIFF'S DETENTION IN SEDGWICK COUNTY

31.     After his first appearance on December 2, plaintiff prepared an inmate request form (a.k.a. "Kite") which stated "I would like to talk to the Detective about my case because this Francisco Javier Reyes is not me."  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 243:4-13; Ex. R, SCDF Inmate Request Form 12/2/05)

32.     The Sheriff's Office has a policy in place for the handling of these kites.  Per that policy, the pod deputy is required to take the Kite from the inmate and pass it on to the appropriate party.  The deputy has no discretion for determining whether to pass the Kite on.  (Ex. O, Deposition excerpts of Major Robert Hinshaw, pp. 40:17- 41:21; 46:17-48:8)

33.     On December 2, plaintiff gave the Kite regarding mistaken identity to pod deputy Hairston.  While deputy Hairston has no recollection of plaintiff or this specific Kite, she was familiar with the office policy regarding handling of Kites and is certain she placed the subject Kite in the assigned bin for the inmate coordinator.  (Ex. U, Deposition excerpts of Deputy Hairston, pp. 15:5-24:5)

34.     It is the practice of the Sheriff's Office that if a Kite requests an audience with the

Wichita Police Department, the Kite is sent to the inmate coordinator who would the forward it to the appropriate entity.  (Ex. U, Deposition excerpts of Deputy Hairston, pp. 20:13-21:12)

35.    The Wichita Police Department did not contact plaintiff in response to his Kite.  (Ex. C, Deposition excerpts of Plaintiff Reyes, p. 246:7-247:4)

36.    The instructions on the Kite direct the inmate to follow up with the Watch Supervisor if they receive an unsatisfactory response the their Kite.  (Ex. T, SCDF Inmate Request Form 12/9/05, p.2)

37.    Plaintiff did not follow up with the Watch Supervisor when he did not get a response to his Kite referencing mistaken identity.  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 246:3-6)

38.    Plaintiff did prepare two additional inmate request forms, on December 7 and December 9, requesting items from the inmate commissary.  Neither of these requests mentioned mistaken identity.  (Ex. S and T, SCDF Inmate Request Forms 12/7/05 and 12/9/05)

39.    Besides the inmate request form and the alleged reference to the fingerprinting technician, plaintiff made no other efforts during his two-week detention to notify Sedgwick County Sheriff's Office of the mistaken identity.  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 248:24-249:7)

40.    Sometime after plaintiff's first appearance, his family retained the additional legal services of private defense counsel.  (Ex. C, Deposition excerpts of Plaintiff Reyes, p. 184:24-185:8)

41.    Between December 6 and December 15, plaintiff was visited by his public defender and his private counsel on six different occasions.  (Ex. P, Investigation report of Major Hinshaw, p. 3)

42.    It was not until December 15 that one of plaintiff's defense attorneys brought the mistaken identity to the attention of Assistant District Attorney Salguero, and neither of his attorneys ever brought the mistaken identity to the attention of the Sheriff's Office.  (Ex. P, Investigation report of Major Hinshaw, p. 6)

43.    On December 15 at approximately 4:13, plaintiff was released from SCDF.  (Ex. Q, SCDF Inmate log, p. 2)

44.    Neither Sheriff Gary Steed, nor Under Sheriff Robert Hinshaw, ever had any direct contact with plaintiff during his detention, nor does plaintiff have any evidence to suggest they were aware of plaintiff during his detention.  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 176:18-178:9, p. 178:10-18)

8

**PLAINTIFF GENERALLY**

45.     Plaintiff has brown eyes.  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 189:5-6)

46.     Plaintiff has dark brown hair that could easily be mistaken for black.  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 189:7-19)

47.     Plaintiff has a six-inch scar that runs along his right forearm.  (Ex. C, Deposition excerpts of Plaintiff Reyes, pp. 189:20-190:8)

## ANALYSIS AND AUTHORITY

**I.      Defendants are entitled to summary judgement on plaintiff's 42 U.S.C. § 1983 Claim.**

**A.      Plaintiff's § 1983 claim must be dismissed because plaintiff was not deprived of a constitutionally protected right as defined by either the Supreme Court or the Tenth Circuit.**

1.      <u>Plaintiff must first prove the existence of a constitutionally protected right.</u>

The first step in any analysis of a § 1983 claim is to determine whether there existed an underlying "constitutional right".  *Baker v. McCollen*, 443 U.S. 137, 140 (1979).  When there is no underlying constitutional right, there can be no violation of a constitutional right and, the analysis need go no further.  *Rudkin v. Sedgwick County*, 469 F. Supp. 2d 953, 958. (D. Kan. 2007). When determining whether a constitutional right exists, any doubts are to be resolved against the § 1983 plaintiff.  *Sanchez v. Swyden*, 139 F.3d 464, 467 (5th Cir. 1998).

2.      <u>Neither the Supreme Court nor the Tenth Circuit have recognized a constitutionally protected right to a post-arrest investigation.</u>

Plaintiff was arrested in Colorado as a result of mistaken identity, and his § 1983 claim against these defendants alleges they failed to conduct a post-arrest investigation that would have sooner uncovered the same.  There can be no disagreement, the controlling law as it pertains to

plaintiff's § 1983 claim, is *Baker v. McCollen*, 443 U.S. 137, 140 (1979).[1]  In *Baker,* while noting

the Constitution does not guarantee only the guilty will be arrested, the Supreme Court held,

> The Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished "without due process of law." . . . .  Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. **Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim.** The ultimate determination of such claims of innocence is placed in the hands of the judge and the jury

*Id.* at 145-146 (emphasis added).  Given the Court's clear holding that there is no constitutional right

to a post-arrest investigation, and hence no violation of a constitutional right herein,  plaintiff's §

1983 claim can be swiftly dismissed without further analysis. However, in an effort to avoid the

inevitable, plaintiff is attempting to fashion a constitutional right out of the *Baker* court's expressed

reservation of a possible constitution right, which might arise in circumstances not present here.

Apart from its actual holding, the Court stated:

> We may even assume, ***arguendo***, that, **depending on what procedures the State affords** defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of **repeated protests** of innocence will **after the lapse of a certain amount of time** deprive the accused of "liberty . . . without due process of law."

---

[1]In *Baker*, plaintiff was mistakenly arrested on a warrant meant for another.  Despite protests of mistaken identity, plaintiff was held for three days until deputies compared file photos of the fugitive and realized their mistake.  Plaintiff filed a § 1983 claim for the Sheriff Office's failure to determine the wrong person was imprisoned. While noting the error would have been avoided if law enforcement had simply compared the file photograph or fingerprints, the court found there to be no constitutional violation and granted defendants summary judgement.

*Id.* at 145 (emphasis added). In an effort to avoid summary judgement, plaintiff clings to the language, asking this court to recognize a previously undefined constitutional right. However, the Supreme Court's language is clear; there is no constitutional right to a post-arrest investigation. At most, the Court has acknowledged there may one day be circumstances, though not present here, where the Court might recognize facts giving rise to such a right.

In addition to *Baker*, the Tenth Circuit has repeatedly confirmed there is no constitutional violation for negligently failing to conduct a post-arrest investigation. While not a case of mistaken identity, *Romero v. Fay,* 45 F. 3d 1472, 1480 (10th Cir. 1995)*,* is on point. In *Romero*, law enforcement was investigating a homicide. Fay, the investigating officer, interviewed two women who implicated Romero in the crime. Based upon these interviews, Fay found there to be probable cause and arrested Romero four hours later. Romero repeatedly professed his innocence, offered the names of three alibi witnesses and the names of multiple other witnesses who were present for an altercation between the victim and another man on the same night of the crime. However, Fay refused to interview the alibi witness or the witnesses to the altercation. Romero was held for three months before being released on the prosecutor's *nolle prosequi*. Plaintiff filed a § 1983 claim alleging the officers conducted a negligent post-arrest investigation. The 10th Circuit granted defendant's motion for summary judgement, holding that once there existed a determination of probable cause, law enforcement was under no constitutional obligation to continue the investigation or to release plaintiff based upon his pleas of innocence. *Id.* at 1477-81. Additionally, the court held that despite the fact law enforcement failed to "conduct the post-arrest investigation as efficiently as possible", plaintiff failed to allege conduct which amounted to a constitutional violation. *Id,* at 1479.

11

*Romero* is analogous to the present matter in that, as in *Romero*, probable cause for the arrest had previously been established.  (Facts 4-8)  In the present case, the Colorado Trooper had, based upon the matching names, matching Kansas identification number, related birth dates and similar physical characteristics, found there to be probable cause to arrest plaintiff on the warrant.  (Facts 4-8)  Once that probable cause was established, these defendants, as in     *Romero*, were under no obligation to continue the investigation.  And even if they had continued the investigation, any new evidence would not "negate probable cause."  *Romero,* 45 F. 3d at 1478.  While these defendants might have conducted the post-arrest investigation more efficiently, the failure to do so does not amount to a constitutional violation.  *Id.* at 1479.  As for plaintiff's allegation he informed a deputy of the mistaken identity, "the ultimate determination of such claims of innocence is placed in the hands of the judge and jury."  *Id.* at 1480 (emphasis added, internal citations omitted).

The District of Kansas has also confirmed there is no constitutional right to a post-arrest investigation.  In *Rudkin v. Sedgwick County, Kansas*,469 F. Supp. 2d 953 (D. Kan. 2007), plaintiff was mistakenly arrested on a warrant meant for his brother.  Despite the officers' concerns regarding mistaken identity, plaintiff was held until posting bond and later filed a § 1983 claim.  In granting defendants summary judgement, the Honorable Wesley E. Brown, relying in part upon *Baker*, concluded that a person detained as the result of mistaken identity suffers no violation of his substantive due process rights.  *See Id*.  In particular Judge Brown, wrote,

> When such a person asserts he is a victim of mistaken identities, he in effect is pressing a claim of innocence in fact-a claim not analytically distinct from any other factual defense… **Regardless of the merits of the defense, our legal system simply does not rely on police officers to determine its bona fides, even though they may have information bearing on that ultimate question**… To the contrary, once probable cause has been established, a warrant issued,

> and an arrest perfected, the ordinary course is for the prosecutor to
> decide whether to go forward, and if he elects to proceed, for the
> judicial branch to make the final ascertainment of guilt or innocence-
> not for the police to take the matters into their own hands.

*Id.* (emphasis added),(quoting *Brady v. Dill*, 187 F.3d 104 (1st Cir. 1999).

In *Echols v. Unified Government of Wyandotte County,* 399 F. Supp. 2d 1201 (D. Kan. 2005)*,* plaintiff sued several law enforcement officials who prolonged his wrongful detainment by failing to investigate his protests of mistaken identity.  After plaintiff was released upon order of the court, he filed a § 1983 claim. In granting defendants summary judgement, the court noted plaintiff had received "far more than he was constitutionally due" and held,

> **under the law of the Tenth Circuit, there is no constitutional
> violation in this case because a police officer has no duty to
> investigate a detained prisoner's claim of innocence** if the prisoner
> was arrested on a facially valid warrant.  In the end, Mr. Echols's
> section 1983 claim fails to recognize the separate roles played by law
> enforcement officials, prosecutor, and the judiciary.

*Id.* at 1206 (emphasis added).

In *Scull v. State of New Mexico*, 236 F.3d 588, 598 (10th Cir. 2000), the plaintiff filed a § 1983 claim alleging an unlawful **30 day** detention.  While noting a "simple phone call" might have led to the plaintiff's release, the Tenth Circuit granted defendants summary judgement.  The court held that when a plaintiff is arrested on a facially valid warrant, the jailers have no constitutional duty to independently investigate claims of innocence.  *Id.* at 598.

The controlling legal authority is unanimous.[2]  There is no constitutional requirement that

---

[2]The rule of law in the Tenth Circuit is clear.  However, plaintiff is expected to cite the authority of foreign jurisdictions to support the prospect of a constitutional violation.  *See Fairley v. Luman*, 281 F.3d 913 (9th Cir.2002); *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001); *Cannon v. Macon County*, 1 F.3d 1558 (11th Cir. 1993); *Ackins v. City of Chicago*, 441 F.Supp2d 921 (N.D. Ill. 2006).  While not persuasive, upon closer review, these cases can also be

the detaining entity conduct a post arrest investigation.  Without a constitutional right, there can be

no constitutional violation.  Without a constitutional violation, there can be no § 1983 claim.

Because plaintiff was not deprived of a right secured by the Constitution, the analysis need go no

further.

> 3.   <u>If a failure to conduct a post arrest investigation can, at some level, be a violation of a constitutionally protected right, it is not a violation under these circumstances.</u>

Even if we assume, *arguendo*, *Baker's* dicta created a narrowly defined constitutional

violation, the facts at hand would still not amount to a violation.  The *Baker* Court referenced (1) the

extent of plaintiff's protests and (2) the time elapsed, but the Court's primary concern was with (3)

an indefinite detention absent due process procedures.  *See Baker* at 144-45.  In the present case, due

process was timely and abundant.  Within two business days of his arrest, plaintiff appeared in front

of the Arapahoe District Court, wherein he waived extradition without mentioning mistaken identity

to either the court or his public defender.[3]  (Facts 13-16)  Additionally, within 24 hours of his

transfer to Sedgwick County, plaintiff made his first appearance in District Court, where he again

failed to mention mistaken identity.  (Facts 29-30)  With regard to the extent of plaintiff's protests,

if one resolves the factual disputes in his favor, plaintiff protested, at most, on two occasions (during

booking and by Kite).  This does not exceed the "protests of mistaken identity" in the *Baker* case.

While this plaintiff was detained longer than the plaintiff in *Baker*, the pre-hearing detention was

distinguished from the case at bar.

[3]The Extradition Waiver signed by plaintiff states he does not wish to contest the legality of his arrest and that he voluntarily agrees to return to Kansas as a prisoner.  Further, pursuant to C.S.R. 16-19-121, the extradition hearing was the proper time for "identifying the person held as the person charged with the crime."  (2007).

14

only 24 hours and the remaining detention was shorter than other cases where no constitutional violation was found. *See, Romero*, 45 F.3d at 1474 (three months); *Echols v. Unified Gov't of Wyandotte County*, 399 F. Supp. 2d 1201, 1202 (D. Kan. 2005)(twenty-five days); *Scull,* 236 F.3d at 592 (30 days); *and Simmons v. McElveen*, 846 F.2d 337, 339 (5th Cir. 1988)(eight months).

With the three hypothetical concerns of the *Baker* Court not presently here, there is no possible constitutional violation and the analysis need go no further.  Further, in *Rudkin v. Sedgwick County, KS*, 469 F. Supp. 2d 953 (D. Kan. 2007), a warrant was issued for Darren Rudkin.  The warrant noted a tattoo on his back, a scar on his abdomen and a possible alias of Brandon Rudkin (the suspects brother and eventual plaintiff).  Some time later, Brandon Rudkin was stopped for a traffic violation.  Despite the fact Brandon's name appeared only as a possible alias, and despite the arresting officer's confirmation that Brandon did not posses the referenced tattoo or a scar on his abdomen, and over Brandon's pleas of mistaken identity, Brandon was arrested on Darren's warrant.  Upon reaching the jail, Brandon again informed the processing deputies of the mistaken identity and the processing deputies also confirmed the absence of a tattoo or abdomen scar.  The deputies suspected they were detaining the wrong person and eventually were even able to confirm the same when they spoke with Darren via telephone.  Additionally, at some point during his detention, the FBI faxed the deputies a report indicating plaintiff's fingerprints did not match those is the system (the deputies did not notice the report's arrival).  Still, the deputies did not release Brandon until he bonded out later the next morning.

Even in spite of the multiple red flags, the court found there to be no constitutional violation and dismissed plaintiff's § 1983 claim.  Further, the court held "a person arrested pursuant to a valid warrant suffers no violation of his substantive due process right when police continue the detention

15

even after ascertaining that the detainee is innocent". *Id.* at 960 (emphasis added).

As referenced above, in *Romero v. Fay, supra*, the plaintiff was mistakenly detained for approximately **three months** because the officers failed to investigate plaintiff's alibi and to interview exculpatory witnesses. During that time, the plaintiff and his attorney repeatedly protested his innocence and plaintiff was eventually released from custody. In dismissing plaintiff's § 1983 claim, the court held that while the post-arrest investigation was not as efficient as possible, plaintiff failed to assert a constitutional violation. *Id.* at 1479.

In *Echols v. Unified Gov't of Wyandotte County*, 399 F. Supp. 2d 1201 (D. Kan. 2005), Echols was arrested twice (detained for 18 and 25 days respectively) because his name and birth date were mistakenly listed on the warrant for a Mr. Eacholes. The second detention was the focus of plaintiff's § 1983 claim (the first being settled out of court). During his second detention, plaintiff repeatedly professed the mistaken identity to the intake deputy, the booking deputy and seven or eight other deputies at the jail, and despite the fact plaintiff and the fugitive "shared no similar characteristics beyond their names," the only response from the officers was take it up with the judge. *Id.* at 1201-1203. After **24 days**, plaintiff was released upon order of the court and filed a § 1983 claim. In granting defendants summary judgement, the court held **there is no constitutional violation in this case because a police officer has no duty to investigate a detained prisoner's claim of innocence** . . . . *Id.* at 1206 (emphasis added).

The *Brady v. Dill*, 187 F.3d 104 (1st Cir. 1999)*,* opinion has been cited by Tenth Circuit courts. *See Rudkin*, 469 F. Supp. 2d 953 (D. Kan. 2007). In *Brady*, plaintiff was mistakenly arrested on a warrant. From the outset, plaintiff proclaimed his innocence. Eventually, the officers noted discrepancies between plaintiff and the individual sought by the warrant. The fugitive was described

as having a tattoo and that his mother's maiden name was "Kowalski". The officers' investigation revealed plaintiff bore no tattoo and that his mother's maiden name is "Kozloski". In addition, there were discrepancies with regard to height, weight, hair color and eye color. Finally, the officer who originally arrested the fugitive was questioned and provided additional information suggesting there had been a mistaken identity. Despite the officers concerns, plaintiff was not released until after his arraignment. Plaintiff filed a § 1983 action alleging the troopers had a constitutional obligation to release him once they realized they were holding the wrong person.

In awarding defendants summary judgement, the court held "**the Constitution imposes no parallel duty on a police officer to function as a decision maker in order to determine the dissipation vel non of probable cause or the actual innocence of a person in custody.**" *Id.* at 114-115. Additionally, the court noted,

> what seems like a strong argument with the benefit of hindsight is much more dubious when matters are viewed ex ante. The discrepancies involved things like Brady's mother's maiden name, the evanescent tattoo and certain divergent physical traits. But we live in an age where altering physical features maybe be accomplished with facility, where clerical errors in recording, receiving, or transmitting data are commonplace, and where descriptive inaccuracies can occur easily. Thus, courts have concluded with some regularity that relative minor discrepancies in physical featured or other data do not render unreasonable an arrest pursuant to a facially valid warrant.

*Id.* at 113 (internal citations omitted).

The facts of the present case are far less concerning than those in the case law outlined above. Plaintiff was pulled over by a Colorado state trooper for speeding. (Fact 1) Plaintiff's Kansas identification card identified plaintiff as "Francisco J. Reyes" with a birth date of October 10, 1972. (Fact 4) A warrant check run by the trooper during the stop revealed there was an outstanding warrant

17

in Sedgwick County for "Francisco J. Reyes."  (Facts 5-6)  The warrant check provided the exact same Kansas identification card number and listed plaintiff's birth date as one of several used by the wanted fugitive.  (Fact 6)  The trooper also determined plaintiff possessed a scar on his right forearm similar to the fugitive.  (Fact 7)  Finding probable cause, the trooper arrested plaintiff on the Sedgwick County warrant.  (Fact 8)

Plaintiff was transferred to the Arapahoe County Detention Facility (hereinafter "ACDF"), where it was confirmed that plaintiff's forename, middle initial, surname, Kansas ID number and date of birth, matched those associated with the fugitive.  Additionally, the receiving deputy discovered the social security number provided by plaintiff was an exact match.  Based upon all the above, plaintiff was booked into ACDF.  (Facts 8-9)

On November 22, 2005, plaintiff appeared in Arapahoe County District Court.  Plaintiff did not inform his public defender or the court of the mistaken identity.  Instead, plaintiff voluntarily waived extradition.  (Facts 13-16)

On December 1, 2005 plaintiff was booked at the Sedgwick County detention facility (hereinafter "SCDF").  During the booking process, plaintiff alleges he informed the fingerprint technician that his personal information did not completely match the information in the paperwork, but because he was eager to get out of the holding tank, he admits he decided to go ahead and sign off on the paper work.  Plaintiff also admits he did not allege mistaken identity to any of the other officers involved in his processing.  (Facts 22-23)  On December 2, 2005 (within twenty-four hours after his booking in Sedgwick County), plaintiff made his first appearance in Sedgwick County District Court.  He did not  protest his innocence or allege mistaken identity to either the court or the D.A.  (Facts 29-30) However, after returning to his cell following the first appearance, plaintiff

prepared a Kite wherein he stated his desire to speak with the detective to address the issue of mistaken identity.  (Fact 31)  Pursuant to policy, the pod deputy took the Kite from plaintiff and sent it on to the inmate coordinator for forwarding to the police detective.  (Facts 32-34)  The Wichita Police Department did not contact plaintiff in response to his request.  (Fact 35)  While the instructions on the Kites instruct the prisoner to follow up with the next ranking member in the chain of command if the prisoner does not receive a response to his request, plaintiff did not follow-up with regard to his December 2 inmate request.  (Fact 38)  During his two week stay, plaintiff made no other attempts to notify deputies of his identity.  (Fact 39)  He did, however, submit two additional inmate request forms seeking items from the commissary, but neither of those mentioned the mistaken identity.

Plaintiff was visited during his detention in Sedgwick County by two different defense attorneys (his public defender and private defense counsel retained by the family) a total of six times. Neither of his attorneys ever brought the mistaken identity to the attention of the Sheriff's Office. When plaintiff's counsel did finally bring the issue to the attention of the D.A. on December 15, plaintiff was released the same day.   (Facts 41-42)

When compared to the case law above, the present circumstances do not rise to the level of a constitutional violation, because the present circumstances are far less erroneous than prior Tenth Circuit cases wherein the § 1983 claims were dismissed.

**B.    In the event the court identifies a clearly established constitutional violation, these defendants are not liable for the same.**

**1.    The Board of County Commissioners is not a proper party**

Plaintiff has named Board of County Commissioners of Sedgwick County, Kansas (hereinafter

"the Board") as a defendant in this matter.  The Board is not the proper municipal defendant.

State law determines which governmental entity has responsibility in a particular area. *Wilson v. Sedgwick County Board of County Commissioners*, 2006 U.S. Dist. LEXIS 72276, 8 (D. Kan. 2006).  K.S.A. 19-811 places responsibility for the county jail with the Sheriff, not the Board.  Further, the Sheriff is an independently elected official, separate from and not a subordinate to the Board.  As such, only the Sheriff, not the Board, has the power to set policy and train deputies.  *Id.* at 11.  Thus, because state law has vested responsibility for the jail with the Sheriff, and the Board has no authority in this regard, only the sheriff is accountable in a suit stemming from operation of the jail.  *Id.  See also Meade v. Grubbs*, 841 F.2d 1512, 1528, (10th Cir. 1988).  Therefore, summary judgement can be properly entered in the Board's favor.

> **2.     The municipality can not be liable because plaintiff can point to no policy or custom that violated a constitutional right.**

A municipality cannot be held liable under 42 U.S.C. § 1983 on a respondeat superior theory. *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 694 (1977).  Rather, only when the municipality's custom or policy inflicts the injury, can the municipality be liable for a § 1983 claim.  *Id.*

To support municipal liability for a § 1983 claim plaintiff must show (1) an underlying constitutional violation, (2) the existence of a municipal custom or policy and (3) a direct causal link between the custom or policy and the alleged violation.   *Echols*, 399 F. Supp. 2d at 1209; *and Hollingsworth v. Hill*, 110 F. 3d 733, 742 (10th Cir. 1997).  Stated another way, a municipality is liable only when its policy or custom is the "moving force" behind the alleged injury.  *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).    And plaintiff "must show that the municipal

action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and deprivation of federal rights." *Id.* (citation omitted). "[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." *Id.*

First, as discussed in detail above, there is no underlying constitutional violation.  Second, there is no evidence the Sheriff's Office had any unconstitutional custom or policy, or that any such policy affirmatively caused plaintiff's detention.  To the contrary, the uncontroverted facts indicate the Sheriff's Office had policies in place that required further investigation when an inmate's identity is uncertain.  (Facts 27-28) Deputies were to forward finger prints and mug shots of fugitive to the arresting jurisdiction if the arrestee denied being the person named in the warrant or if the arresting jurisdiction requested them.  (Facts 18)  The Sheriff office's written policy required confirmation of identity at booking if there existed doubt as to identity.  Unwritten procedures required deputies throughout the facility to take reasonable actions to verify a detainee's identity if the need for verification arose.[4]  (Facts 27-28)

To the extent plaintiff claims a custom or policy relating to inadequate training, this claim also

---

[4]There was no violation of the Sheriff's policies.  The Colorado authorities did not request mug shots or finger prints.  Thus, those items were not collected and forwarded to the ACDF.  (Fact 19) The Sheriff's Office did nothing to re-verify plaintiff's identity because it relied upon Colorado law enforcement's identification and plaintiff's waiver of extradition rights. Once in the inmate population at SCDF, nothing occurred that would have required a reasonable deputy to further investigate plaintiff's identity.   The statement to the booking officer was too innocuous to justify further investigation.  However, if the officer had been compelled to investigate, the officer would have only looked at the computer information available to him and would have seen the exact match of name, Kansas ID number, social security number and identifying scar.  No mug shots or fingerprints were available to the deputy.  (Facts 22-26) The Kite was passed on as requested by plaintiff.  (Fact 33)  What more did the pod deputy need to do?

fails.  To prevail on such a claim, plaintiff must prove, "the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers ... can reasonably be said to have been deliberately indifferent to the need" for additional training.  *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996)(quotation omitted).   Under this standard, there is no evidence supporting a failure to train claim.

### 3.   Defendants Hinshaw and Steed cannot be liable for plaintiff's § 1983 claim.

#### a.   There is no evidence that either defendant was reckless or grossly negligent in a supervisory capacity.

As supervisors, defendants Steed and Hinshaw are not vicariously liable under § 1983 for the tortuous acts of their employees.  *Barney*, 143 F.3d at 1307.  Rather, a supervisor is only liable under § 1983 if an "affirmative link exists between the [constitutional] deprivation and either the supervisor's 'personal participation, his exercise of control or direction, or his failure to supervise. To be liable, a superior must have participated or acquiesced in the constitutional deprivations of which complaint is made. A supervisor may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable."  *Meade v. Grubbs* 841 F.2d 1512, 1527-28 (10th Cir. 1988)(internal citations omitted). See also  *Specht v. Jensen*, 832 F.2d 1516, 1524 (10th Cir. 1987); "Kite v. Kelly, 546 F.2d 334, 337 (10th Cir. 1976).

Defendant's Steed and Hinshaw had no direct involvement in the detention of plaintiff.  (Fact 94)  There is no evidence that either defendant participated or acquiesced in a constitutional deprivation.  Further, there is no evidence that either defendant acted reckless or grossly negligent in a supervisory capacity.

22

       b.      Defendants Steed and Hinshaw enjoy qualified immunity.

A public official sued in his professional capacity is presumed to be entitled to qualified immunity "under all but the most exceptional circumstances." *Tomkovich v. Kansas Board of Regents*, 159 F. 3d 504, 516 (10th Cir. 1998). In order to overcome defendants' qualified immunity, plaintiff must show: (1) violation of a constitutional right, (2) the subject right was "clearly established" at the time of the alleged violation, and (3) the defendants acted with deliberate or reckless intent. *See Romero,* 45 F. 3d at 1475-78.

The defendants maintain the first step cannot be satisfied as detailed above. However, if plaintiff's allegations do amount to the violation of a constitutional right, plaintiff must next prove "the right was so clearly established at the time of the defendant's unlawful conduct such that a reasonable person in the defendant's position would have known the alleged conduct violated the federal right". *Echols,*399 F. Supp 3d 1201 at 1206. Whether the asserted constitutional right was clearly established is a question of law. *Id.*

The law is only "clearly established when there is a Supreme Court or Tenth Circuit decision on point" at the time of the incident. *Sutton v. Moore*, 173 F.3d 1226,1241 (10th Cir. 1999). *See also Wilson v. Layne*, 526 U.S. 603, 119 S. Ct. 1692 (1999). Further, the law "must have defined the right in quite a specific manner, and that the announcement of the rule establishing the right must have been unambiguous and widespread, such that the unlawfulness of a particular conduct will be apparent ex ante to reasonable public officials." *Brady*, 187 F.3d 104 at 116. Any doubts as to whether a constitutional right is clearly established must be resolved against a § 1983 plaintiff. *Sanchez*, 139 F.3d at 467.

Plaintiff's detention occurred in December 2005. (Facts 20, 43) At the time of plaintiff's

detention, there was no Supreme Court or Tenth Circuit case law establishing a constitutional right to a post-arrest investigation.  In fact, the relevant precedent (*Baker, Rudkin, Echols,* and *Romero*) had established there was no a constitutional right to a post-arrest investigation.   As such, plaintiff cannot prove the violation of a "clearly established" constitutional right.

Even if  plaintiff can shown a clearly established right and violation thereof, plaintiff must then prove individual officers, named in this case, acted with deliberate indifference or reckless intent. *Romero*, 45 F.3d at 1478.  Allegations that a police officer acted negligently are insufficient to sustain a § 1983 claim against defendant officials.  *Id*. Bare allegations of malice are insufficient to carry the burden.  *Harlow*, 457 U.S. at 818.

There is not evidence that Steed and Hinshaw knew anything about plaintiff's detention until it was over or nearly over.  There is no evidence their conduct was negligent, much less indifferent or reckless.  Hence, there is no place in this lawsuit for individual claims against Steed and Hinshaw.

## II.     Defendants are entitled to summary judgment on plaintiff's state law tort claims.

Summary judgment is proper against plaintiff's state law tort claims.  Plaintiff's single state law tort claim is false imprisonment despite his assertion that the defendants are also liable to him under a negligence theory.  (Doc. 32, Pretrial Order, p. 10)  His false imprisonment claim fails because his arrest and, as a result, subsequent detention were lawful.  However, even if plaintiff had otherwise valid claims for false imprisonment and/or negligence, the defendants possess governmental immunity against common law liability pursuant to K.S.A. 75-6104(e).

### A.     Plaintiff's only real common law tort claim is false imprisonment.

The terms "false arrest" and "false imprisonment" are both used in Kansas to mean any unlawful physical restraint by one of another's liberty, whether in prison or elsewhere. *Brown v. State*,

24

261 Kan. 6, Syl. ¶ 1,  927 P.2d 938 (1996).  "A person seeking to recover for false arrest or false imprisonment must prove that he was unlawfully caused to be arrested by the defendants." *Thompson v. General Finance Co., Inc*., 205 Kan. 76, Syl. ¶ 1, 468 P.2d 269 (1970).  *Accord, Glassey v. Ramada Inn*, 5 Kan. App. 2d 121, 126, 612 P.2d 1261 (1980).

In both *Brown v. State*, *Supra*, at Syl. ¶ 2, and *Soto v. City of Bonner Springs*, 38 Kan. App. 2d 382, 385, 156 P.3d 652 (2007), the Kansas courts recognized that a claim for damages from unlawful physical restraint cannot be converted into a negligence cause of action merely by clever pleading.  In *Brown*, the Kansas Supreme Court applied the one year statute of limitations applicable to false imprisonment, instead of the general tort two year statute, to bar plaintiff's claim, stating:

> A cause of action which alleges negligent conduct by law enforcement
> officers which results in false arrest and consequent damages is a cause
> of action for false arrest and imprisonment.

261 Kan. at Syl. ¶ 2.  The Court reasoned the damage sought by Brown for loss of freedom, humiliation, fear, embarrassment, mental anguish and loss of earnings were are caused by his detention, not any alleged negligence. *Id.* at 13, 15.

A similar concept was applied discussed in *Moss v. Mamalis*, 36 Kan. App. 2d 151, 159 (2006).  There the court restated the rule that "[a] law enforcement officer's duty is to the general public, not to any specific individual, unless a party is able to demonstrate a special relationship creating specific duties toward the individual by the officer." *Id.*, citing *Mills v. City of Overland Park*, 251 Kan. 434, 446, 837 P.2d 370[1]  It applied this rule to hold a probation officer could not be held liable for alleged negligence in allowing the plaintiff's supervised probation to extend 24 months beyond that ordered.  The officer's duties were owed to the public generally, not the plaintiff.

Here the only negligence plaintiff claims resulted in his alleged false imprisonment damages. Plaintiff's claimed actual damages are the same for each of the substantive theories of liability he has advanced.  Doc. 32, Pretrial Order, p. 16.  He asserts he is entitled to damages to compensate him for lost income, attorney fees, medical expense and emotional distress, mental anguish and embarrassment which damages he maintains all flow from his detention at the SCDF.  *Id*., pp. 5, 16. Therefore, his claim sounds in false imprisonment, not negligence.  Likewise, the defendants owed no legal duty to plaintiff to refrain from negligence concerning the duration of his detention.  Rather, their duty and potential liability, at common law, was for false imprisonment.

**B.   Defendants did not unlawfully detain plaintiff.**

In *Porter v. Stormont-Vail Hospital*, 228 Kan. 641, 646, 621 P.2d 411  (1980), the court approved the following application of false imprisonment law from the trial court's decision:The general rule accepted in Kansas, is stated in 32 Am.Jur.2d, False Imprisonment, § 66, at page[s] 127[-28] as follows:

> "An arrest . . . by virtue of process regular and legal in form, duly issued by a court, magistrate, or body having authority to issue it, and executed in a lawful manner, does not constitute false arrest or imprisonment. Valid process is a complete justification for the acts done under it and in compliance with[3] It protects the person who [sued] it out, as well as the officer who executed it, in the case of a warrant of arrest. . . ."

The arrests, and imprisonments resulting therefrom, of which plaintiff complains were made pursuant to bench warrants issued out of the Shawnee County Magistrate Court. PIK [Civ.] and 14.21 provides in relevant part as follows:

> "A legal excuse for the restraint of the personal freedom of an individual is a defense to an action  for

26

> (false imprisonment) (false arrest).   A legal excuse
> exists:   1. When an officer arrests with a valid
> warrant."

> All arrests of plaintiff, and imprisonments arising therefrom, were
> pursuant to valid warrants issued by a magistrate and therefore do not
> constitute false arrest or imprisonment.

*Id.*  See also RESTATEMENT (SECOND) OF TORTS § § 125(a) & 134, comment a (Privilege to retain

arises from receipt of prisoner from party that was privileged to make an arrest).

In this case, as in *Porter*, plaintiff's arrest was under by a facially valid warrant. Therefore,

his detention at the SCDF was lawful, defeating his claim for false imprisonment.

### C.    Defendants possess governmental immunity.

K.S.A. 75-6104(e) provides a governmental entity or an employee acting within the scope of

the employee's employment shall not be liable for damages resulting from:

> any claim based upon the exercise or performance or the failure to
> exercise or perform a discretionary function or duty on the part of a
> governmental entity or employee, whether or not the discretion is
> abused and regardless of the level of discretion involved.

*Id.*  This immunity applies to plaintiff state common law claims because, if sufficient facts are present

to support probable cause, law enforcement's decisions concerning evaluation of information

pertaining to the identification of a suspect for the purpose of an arrest, detention or their opposites

are inherently discretionary.  *Mendoza v. Reno County*, 235 Kan. 692, 694, 681 P.2d 676 (1984); *Soto*

*v. City of Bonner Springs*, 38 Kan. App. 2d at 385.

In *Soto*, plaintiff was stopped for a traffic violation and identified himself as Jose M. Soto,

with a birth date of December 26, 1973.  The officer ran a warrant check and was advised of a warrant

for Jose L. Soto, with a birth date of December 24, 1973.  Despite the discrepancies, the officer

decided to arrest the plaintiff.  Plaintiff was held for  two days before officers noticed he did not resemble the person pictured on the warrant.  In granting defendant's motion for summary judgment against plaintiff's false imprisonment claim, the Kansas Court of Appeals wrote, **"there is a large amount of discretion when determining whether an individual is actually the person identified in a warrant.  Therefore, we believe the facts of this case fall squarely within the discretionary function exception to the KTCA."**  *Id.* at 386-87.

## CONCLUSION

THEREFORE, for the reasons stated above, defendants respectfully request an order of the court granting their motion for summary judgment.

/S/ Arthur S. Chalmers
Arthur S. Chalmers #11088
HITE, FANNING & HONEYMAN L.L.P.
100 North Broadway, Suite 950
Wichita, Kansas 67202
Telephone:   (316) 265-7741
Facsimile:   (316) 267-7803
E-mail:   chalmers@hitefanning.com
Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 13th day of March, 2008, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/S/ Arthur S. Chalmers