## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

FRANCISO J. REYES,           )
                                   )
                  Plaintiff,     )
                                   )
v.                               )     Case No. 07-CV-2193-KHV
                                   )
BOARD OF COUNTY COMMISSIONERS )
OF SEDGWICK COUNTY, KANSAS;    )
GARY STEED, SEDGWICK COUNTY    )
SHERIFF; and ROBERT HINSHAW,     )
SEDGWICK COUNTY UNDERSHERIFF, )
                                   )
                  Defendants.   )
_____)

## MEMORANDUM AND ORDER

Francisco Jose Reyes brings suit against the Board of County Commissioners of Sedgwick County Kansas ("the Board"), Sheriff Gary Steed and Undersheriff Robert Hinshaw under 42 U.S.C. § 1983 and Kansas common law. Specifically, plaintiff alleges violations of the Fourth and Fourteenth Amendments, false imprisonment and negligence. This matter comes before the Court on Defendants' Motion For Summary Judgment (Doc. #33) filed March 13, 2008. For reasons stated below, the Court finds that defendants' motion should be sustained in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit

under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on his pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the parties opposing the motion for summary judgment. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

### Factual Background

The following material facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff.

On November 18, 2005, Phillip Gallegos, a Colorado State Trooper, stopped plaintiff Francisco Jose Reyes for speeding in a construction zone in Arapahoe County, Colorado.  Plaintiff did not have a valid driver's license, but he produced a Kansas identification card (No. K00951769) which identified him as Francisco J. Reyes with a birth date of October 10, 1972.  See Gallegos Depo. at 14-15, attached as Ex. A to Defendants' Memorandum In Support Of Motion For Summary Judgment ("Defendants' Memorandum") (Doc. # 34).  Gallegos contacted the Colorado State Patrol Dispatch Center to check for outstanding warrants on Francisco J. Reyes with that birth date and Kansas identification number K00951769.  The dispatcher informed Gallegos that Sedgwick County, Kansas had an outstanding rape warrant for a Francisco J. Reyes with the same Kansas identification card number.[1]  The dispatcher told Gallegos that "a number of different names" were associated with the warrant.  See id. ¶ 7. The dispatcher also told Gallegos that plaintiff's birth date matched one of several birth dates which the fugitive used.  Gallegos determined that plaintiff had a scar on his right arm, which was one of the identifying descriptors for the fugitive.  Plaintiff told Gallegos that he was not the person sought in the warrant, but Gallegos arrested him and transported him to the Arapahoe County jail.[2]

The Arapahoe County jail received a printout from the Federal Bureau of Investigation National Crime Information Center ("NCIC") on the Sedgwick County warrant.  It showed nine aliases attributed

_____

[1]      On April 1, 1991, Sedgwick County District Court Judge Paul Clark had signed a warrant charging a different Francisco Reyes – Francisco Javier Reyes – with three counts of rape. The warrant provided three aliases:  "Poncho Reyes," "Francisco Reyes Carillo" and "Francisco * Reyes."  The warrant listed a social security number ending in 7513 and a birth date of October 10, 1963 (the same date but different year from plaintiff's).  See Warrant, attached as Ex. I to Defendants' Memorandum.

[2]      The record contains no evidence that Gallegos communicated plaintiff's claim of mistaken identity to anyone in Arapahoe County, Colorado or Sedgwick County, Kansas.  Because the record reveals no information that defendants in this case received this information, it has no bearing on their liability, and the Court disregards it.

to the warrant.[3]  See NCIC teletype, attached as Ex. 34-9 to Defendants' Memorandum. At the jail, the booking officers asked plaintiff what name he went by and discussed among themselves the large number of aliases or alternate names attributed to the Sedgwick County warrant.  The receiving deputy confirmed that plaintiff had the same first name, middle initial and surname as set out in the warrant; that plaintiff's birth date was one of six alias birth dates which the fugitive used; and that plaintiff's Kansas identification card number and social security number matched numbers linked to the fugitive. See Nesvold Affidavit ¶¶ 7-14; attached as Ex. D to Defendants' Memorandum, Booking Report, attached as Ex. G to Defendants' Memorandum; NCIC Warrant Teletype dated November 18, 2005, attached as Ex. E to Defendants' Memorandum.

The Arapahoe County booking report listed plaintiff's name as Francisco Jose Reyes.  No name or alias in the NCIC printout included the middle name Jose, but several of them included the name Javier.  The booking report listed plaintiff's height and weight as 5'10" and 185 pounds, while the NCIC printout showed the fugitive's height and weight as 5'6" and 145 pounds.  The printout listed Nicaragua as plaintiff's birthplace and Mexico as the fugitive's birthplace.  The booking report listed plaintiff's social security number as XXX-XX-3998, one of three social security numbers which the NCIC attributed to the warrant.

On November 21, 2005, a Sedgwick County sheriff's deputy faxed the warrant to Diane Shouse, the Arapahoe County fugitive warrants clerk.  That same day, Shouse obtained NCIC printouts for Francisco J. Reyes and Francisco R. Carillo, an alias on the Sedgwick County warrant.  The warrant contained only the birth date of October 10, 1963 and the social security number of XXX-XX-7513 –

---

[3]     The NCIC is the FBI's national computerized data bank, designed to assist federal, state and local law enforcement agencies.  The NCIC system contains inaccurate information on some suspects.

neither of which belonged to plaintiff.  See Warrant, attached as Ex. I to Defendants' Memorandum. The NCIC printout for plaintiff correctly listed a birth date of October 10, 1972, a height of 5'9", a weight of 190 pounds and the birthplace of Nicaragua.

The NCIC printout for Francisco R. Carillo (one of the aliases on the warrant) listed a birth date of October 10, 1962 (an "alternative" birth date on the warrant); a height of 5'6"; a weight of 145 pounds; Mexico as the place of birth; and a social security number of XXX-XX-7513 (the same social security number as the Sedgwick County rape warrant).[4]  Shouse compared plaintiff's information with that provided for the fugitive.  The booking report identified plaintiff's middle name as Jose, and the warrant listed the fugitive's middle name as Javier.  The booking report also listed plaintiff's birth date as October 10, 1972, while the warrant provided the fugitive's birth date as October 10, 1963.  Because of these discrepancies, Shouse spoke to her supervisor.  She nonetheless was satisfied that plaintiff was the fugitive identified in the warrant, so she completed the case and sent it to the District Attorney.

On November 22, 2005, plaintiff appeared in Arapahoe County District Court with his public defender, Chris Baumann.  Baumann gave the court a written Advisement of Rights in which plaintiff acknowledged that he understood his rights, including the right to challenge the legality of the arrest and contest extradition.  See Affidavit of Stephen Fauver ¶ 9, attached as Ex. J to Defendants' Memorandum; Advisement of Rights, attached as Ex. K to Defendants' Memorandum.  Baumann told the court that plaintiff was voluntarily waiving extradition  and gave the court an executed waiver of

---

[4]      The NCIC printout which Shouse obtained for "Francisco Reyes" showed fingerprint pattern data of WU WU WU WU WU WU WU WU WU WU.  See Dominguez Depo. at 22-23.  The NCIC printout for Carillo showed fingerprint data of WU, RS, RS, WU, WU, WU, WU, WU, WU, LS.  Id.  If the fingerprint pattern data was correct, Francisco Reyes and Francisco Carillo were not the same person.  Shouse did not understand the fingerprint data on the NCIC printout and did not use that information for any purpose.  Based on discrepancies in personal information, Shouse decides whether to ask for a fingerprint comparison.  If Shouse had known that the fingerprints of plaintiff and Carillo were different, she would have requested a fingerprint comparison.

extradition.  See Transcript of Hearing, attached as Ex. N to Plaintiff's Memorandum; Waiver of Extradition, attached as Ex. L to Plaintiff's Memorandum.  Plaintiff and Baumann did not claim that plaintiff was not the person named in the warrant.  In fact, plaintiff never told his attorney that he was not the person named in the warrant; he simply said that he wanted to waive extradition to Kansas.[5]

On November 22, 2005, Arapahoe County notified the Sedgwick County Sheriff's Department that plaintiff had waived extradition.  Sedgwick County did not send mug shots or fingerprints to Arapahoe County because Arapahoe County did not request them and the Sheriff's Department interpreted plaintiff's waiver of extradition as a concession that plaintiff was the person named in the warrant.  See Hinshaw Depo. at 54, 117-19, attached as Ex. O to Defendants' Memorandum.

On December 1, 2005, two Sedgwick County deputies transported plaintiff to Sedgwick County on a county-owned airplane.  During the flight, plaintiff did not complain of mistaken identity.  The deputies took plaintiff to the Sedgwick County jail, where they booked him.  Plaintiff testified about the booking process as follows:

> Q.    As to any of the folks that you talked to them, . . . did you tell them that "you got the wrong guy; I'm not the correct Francisco Reyes?"
>
> A.    Yes. . . . The finger -- The ones that did my fingerprints, I told them I am not this guy.
>
> Q.    What did they say?
>
> A.    They said, "Well, the faster we get this done, the faster you go to population." . . . I wanted to go get a bed because I was sleeping on the floor at the holding tank. . . . So I went ahead and signed it just to get a cell.

See Reyes Depo. at 226-27, attached as Ex. C to Defendant's Memorandum.  The booking officers asked

---

[5]    When asked why he did not tell Baumann that he was the "wrong guy," plaintiff responded that "[i]t was very fast. . . He just barely spoke to me and left."  See Reyes Depo. at 116, 182-83, attached as Ex. C to Defendants' Memorandum.

plaintiff to sign a card which said (among other things) that he was from Mexico.  Plaintiff said that he did not want to sign it because he was from Nicaragua.  The officer said, "Well, sign it now, it's faster, and you can deal with it later."  See id. at 227.  The officer asked if Nicaragua was a city in Mexico, so at that point, plaintiff stopped talking to him.  See id. at 228.  Except for this exchange, plaintiff did not claim mistaken identity to any officer involved in his processing.

At approximately 1:40 p.m. on December 2, 2005, plaintiff made his first appearance in Sedgwick County District Court.  At that hearing, plaintiff did not protest his innocence or allege mistaken identity to either the court or the District Attorney.

After his first appearance on December 2, 2005, plaintiff prepared an inmate request form commonly called a KITE.  On the form next to his name, plaintiff wrote "DOB 10-10-72" and his social security number.  The request stated "I would like to talk to the Detective about my case because this Francisco Javier Reyes is not me."  Under "Franciso Javier Reyes," plaintiff wrote "10-10-63" (the birth date of the fugitive) and the social security number listed on the warrant.  Plaintiff's Depo. at 243, attached as Ex. C to Defendants' Memorandum; Inmate Request Form 12/2/05, attached as Ex. R to Defendants' Memorandum.

The inmate request form is a carbonless three-copy form for inmates to address concerns to staff, courts, detectives or the commissary.  Under Sedgwick County jail procedures, an inmate fills out the form and gives it to the pod deputy.  The pod deputy initials the form, dates it, gives one copy back to the inmate and sends the other two copies to the inmate coordinator, who decides how to proceed.  If the deputy can handle the inmate's concern or issue, he or she may do so even if the KITE is addressed to a ranking officer.  See Hairston Depo. at 15-24, attached as Ex. U to Defendants' Memorandum.  The official who receives the form writes a response, keeps a copy and sends the remaining copy back to the

inmate.  See Hinshaw Depo. at 40-41; 46-48, attached as Ex. O to Defendants' Memorandum.  The instructions on the form direct the inmate to follow up with the watch supervisor if he does not receive a satisfactory response.

On December 2, 2005, plaintiff gave his inmate request form to Deputy Lanetta Hairston.  She placed her identification number and date on the request.  Hairston does not recall plaintiff or specifically remember taking his request form, but she is certain that she placed the request in the inmate coordinator's bin and she presumes that the inmate coordinator properly processed the request.  Hairston Depo. at 2, 15-24, attached as Ex. U to Defendants' Memorandum,

The rape warrant did not identify the law enforcement agency which initiated or investigated the case.  Neither the Sheriff's Department or the Wichita Police Department contacted plaintiff in response to his inmate request, however, and plaintiff did not follow up with the watch supervisor when he did not get a response.  See plaintiff's Depo., attached as Ex. C to Defendants' Memorandum, at 246.

According to Undersheriff Hinshaw, jail personnel should obtain a fingerprint comparison if there is a question about an inmate's identity.[6]  Mug shots and fingerprints are generally available, but the fugitive fingerprints in this case were not immediately accessible because they were in the file of the city detective who originally handled the rape case.  Also, because the mug shot for the fugitive was not digital, the Sheriff's Department could not view it on the computer system when it processed plaintiff.  See Investigation Report Of Major Hinshaw at 5, attached as Ex. P to Defendants'

---

[6]     Sheriff Steed does not believe that his facility necessarily should have obtained a fingerprint comparison in this case, but he believes that it would have been helpful if Colorado authorities had compared fingerprints.  The Sheriff's Department did not have an employee who was qualified to interpret fingerprints, but it routinely scanned fingerprints and e-mailed them to the Kansas Bureau of Investigation for comparison.  Also, the Police Department for the City of Wichita had certified fingerprint examiners, and it is located less than one block from the Sedgwick County jail.

Memorandum.[7]

At his deposition, Sheriff Steed was initially unsure whether his department had a specific policy on how to determine if a person booked on a warrant is, in fact, the right person. Steed Depo. at 15, attached as Ex. Y to Defendants' Reply (Doc. # 49) filed May 22, 2008. He testified that the department has so many policies that he can not remember them all, but he later acknowledged that the department has written policies which pertain to identification of persons being booked. In fact, Sheriff's Office Policy 103.02 provides as follows: "If there is any doubt about the identity of a person,

---

[7]     Plaintiff objects to the Investigation Report Of Major Hinshaw as hearsay, as follows:

The investigation report of Major Hinshaw is inadmissible hearsay if offered by the Defendants in this case. It fits no hearsay exception. The report is an after-the-fact review of Reyes's incarceration and, as such, does not reflect a regularly conducted business activity of the type contemplated in F.R.E. 803(6). Likewise, it is not a report compiled pursuant to "authority granted by law" so as to be admissible under F.R.E. 803(8) in that the Sedgwick County Sheriff's Department has no statutory duty to conduct internal evaluations of that type. See Marsee v. U.S. Tobacco Co., 866 F.2d 319, 325 (10th Cir. 1989). Also, there are insufficient indicators of trustworthiness in an ad hoc, self-investigation in the face of potential legal liability to permit admission of the report either under an exception in F.R.E. 803 or in the face of F.R.E. 403 (tendency to mislead jury would outweigh any relevance).

Plaintiff's Response, Doc. #48 at 7, 9. Plaintiff's objection is without merit.

Fed. R. Evid. 803(6) excepts business records from the hearsay exclusion. Defendants have offered uncontroverted evidence that the Sheriff's Department regularly conducts internal investigations and prepares reports. See Haskell v. U.S. Dept. of Agric., 930 F.2d 816, 819 (10th Cir. 1991) (reports prepared in normal course of law enforcement investigations admissible under 803(6)). Further, Fed. R. Evid. 803(8) exempts reports of public offices from the hearsay exclusion. The Sheriff has authority to investigate allegations and internal matters. K.S.A. § 19-811. See Perrin v. Anderson, 784 F.2d 1040, 1047 (10th Cir. 1986) (report of department's shooting review board admissible pursuant to Rule 803(8)); Wilson v. Beebe, 743 F.2d 342, 346-47 (6th Cir. 1984) (admitting report by police captain that officer's conduct was contrary to training); Herrick v. Fairchild Corp., 298 F.3d 1184, 1192 (10th Cir. 2002) (advisory committee notes to Rule 803(8) indicate that intent of drafters was to allow admission of investigations by officials in executive branch). See also Keith v. Volpe, 858 F.2d 467, 481 (9th Cir. 1988) (presumption is one of trustworthiness, with burden of establishing untrustworthiness on opponent of the evidence).

conflicting data, or insufficient information on the Journal Entry, the Booking Sergeant will be contacted*."* See General Order, attached as Ex. V to Defendants' Memorandum. Sheriff's Office Policy 107.00 also provides that when an inmate's identity is not "immediately verifiable," he or she may be accepted under the name of "John or Jane Doe." It further provides that the Records Section will be notified and  a set of fingerprints will be taken to make a positive identification. See General Order, attached as Ex. W to Defendants' Memorandum.

Undersheriff Hinshaw testified that unwritten policy and deputy training in the Sheriff's Department require reasonable measures to verify that the correct person is in custody. See Hinshaw Depo. at 12-13, 76-77, attached as Ex. O to Defendants' Memorandum; Investigation Report of Major Hinshaw at 5-6, attached as Ex. P to Defendants' Memorandum. Sergeant Nelson testified that "if somebody says they ain't the person . . . you kind of check to see pictures or mugs[.]" Nelson Depo. at 47, attached as Ex. X to Defendant's Memorandum.

Some time after plaintiff's first appearance, his family retained private defense counsel. Between December 6 and 15, 2005, the public defender and/or private counsel visited plaintiff six times. Neither attorney brought any mistaken identity to the attention of the Sheriff's Department. See Investigation Report of Major Hinshaw, attached as Ex. P to Defendants' Memorandum at 6. On December 15, however, one of plaintiff's attorneys told the assistant district attorney about the mistaken identity. Later that day, defendants released plaintiff.

During his two-week detention, except through the inmate request form and his statement to the booking technician, plaintiff made no effort to notify the Sheriff's Department of the mistaken identity. See Plaintiff's Depo. at 248-49, attached as Ex. C to Defendants' Memorandum. Plaintiff prepared additional inmate request forms on December 7 and 9, 2005, requesting items from the commissary.

Neither request mentioned mistaken identity.

Sheriff Steed and Undersheriff Hinshaw had no direct contact with plaintiff during his detention.

In February of 2006, law enforcement officials in Pensacola, Florida informed the Sheriff's Department that they had arrested the fugitive on a drug charge on August 26, 2005, and released him on time served on January 3, 2006.

Under 42 U.S.C. § 1983, plaintiff claims that in his official capacity, Sheriff Steed – by detaining him for two weeks on an arrest warrant for another man – violated (1) his right to be free of unreasonable government seizures under the Fourth Amendment and (2) his right to substantive due process under the Fourteenth Amendment.  Defendants assert that the Board is entitled to summary judgment on plaintiff's Section 1983 claims because it is not responsible for the Sheriff's conduct. Defendants also argue that Sheriff Steed is entitled to summary judgment because (1) plaintiff had no constitutional right to a post-arrest investigation; (2) plaintiff cannot show that the Sheriff's policy or custom caused a constitutional violation and (3) plaintiff cannot show that Sheriff Steed acted recklessly or was grossly negligent in a supervisory capacity.[8]

Under Kansas common law, plaintiff asserts that the Board, Sheriff Steed and Undersheriff Hinshaw (1) falsely imprisoned him for two weeks on an arrest warrant for another man and (2) negligently failed to train staff to identify persons named in warrants.  Defendants assert that they are

---

[8]     Sheriff Steed and Undersheriff Hinshaw also assert that they are entitled to summary judgment because they are entitled to qualified immunity.  Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity only relieves defendants of individual liability, however, and plaintiff brings only official capacity claims.  The Court therefore need not address the qualified immunity defense.

entitled to summary judgment on plaintiff's false imprisonment claim because (1) plaintiff's detention was lawful or (2) they are entitled to immunity under the discretionary function exception, K.S.A. § 75-6104(e).  Defendants assert that they are entitled to summary judgment on plaintiff's negligence claim because negligent conduct which results in false arrest or imprisonment only gives rise to a cause of action for false arrest or imprisonment.

<u>Analysis</u>

**I.      Section 1983 Claims**

A.      <u>Eleventh Amendment Issues</u>

Plaintiff does not assert a Section 1983 claim against anyone but Sheriff Steed in his official capacity.[9]  In all respects other than name, an official-capacity suit is a suit against the entity.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985); <u>Moore v. City of Wynnewood</u>, 57 F.3d 924, 929 n.4 (10th Cir. 1995).  It is not entirely clear, however, whether Sheriff Steed is an officer of the county or of the State of Kansas.  <u>See</u> <u>Moore v. Bd. of County Commr's of Leavenworth County</u>, 470 F. Supp. 2d 1237, 1255-56 (D. Kan. 2007) (comparing <u>Bd. of County Comm'rs of Lincoln County v. Nielander</u>, 275 Kan. 257, 261 (2003) (sheriff is state officer whose duties, powers and obligations derive from legislature), with <u>Schroeder v. Kochanowski</u>, 311 F.Supp.2d 1241, 1249 n.23 (D. Kan. 2004) (rejecting argument that sheriff is state official and that Eleventh Amendment therefore bars claim against him).  If Sheriff Stead is an officer of the county, an official capacity suit against him is equivalent to an action against the Board of County Commissioners, <u>i.e.</u> the County.  <u>See</u> <u>id.</u> at 1245 n.17 (official capacity claims against sheriff equivalent to action against county).  On the other hand, if Sheriff Steed is an officer of the State

---

[9]      Plaintiff alleges that "defendant sheriff, in his official capacity, deprived plaintiff of [his rights under the Fourth and Fourteenth Amendments] by or though his department's custom or policy." <u>Pretrial Order</u> (Doc. #32) filed March 4, 2008, ¶¶ b(1)(b), b(2)(b).

of Kansas, an official capacity suit against him is equivalent to an action against the State, and the Court

must examine whether the Eleventh Amendment bars plaintiff's official capacity claims against him.[10]

---

[10]    Sheriff Steed did not claim Eleventh Amendment immunity in this case, but the Eleventh Amendment has jurisdictional attributes and may be raised at any point. See Edelman v. Jordan, 415 U.S. 651, 677-78 (1974); Ambus v. Granite Bd. of Educ., 975 F.2d 1555, 1559 (10th Cir. 1992), modified on other grounds on reh'g, 995 F.2d 992, 994 (10th Cir. 1993). The summary judgment briefs do not address whether Sheriff Steed is entitled to Eleventh Amendment immunity, or whether the State of Kansas had waived any such immunity. Because the Eleventh Amendment immunity implicates subject matter jurisdiction, however, the Court may address it *sua sponte*. See Johns v. Stewart, 57 F.3d 1544, 1552-53 (10th Cir. 1995). Therefore, on June 25, 2008, the Court ordered plaintiff to show cause why it should not find that the Eleventh Amendment barred his claim against Sheriff Steed in his official capacity. See Order To Show Cause (Doc. #60) at 4-5.

The Eleventh Amendment bars a request for money damages against a state defendant in his official capacity. See White v. Colorado, 82 F.3d 364, 366 (10th Cir. 1996); Meade, 841 F.2d at 1529 n.17 (Eleventh Amendment sovereign immunity bars actions for damages against state officers in official capacities). Only a state, however, or the "arms" of a state, may assert the Eleventh Amendment as a defense to suit in federal court. Ambus, 975 F.2d at 1560.

In Hunter v. Young, 238 Fed. Appx. 336, 338 (10th Cir. 2007) (unpublished), the Tenth Circuit implicitly found that a county sheriff is an officer of the State of Kansas. In Hunter, plaintiff asserted that the State of Kansas had waived any Eleventh Amendment immunity by enacting K.S.A. § 19-811, which provides that a sheriff has "charge and custody of the jail of his county" and that the sheriff and his sureties shall be liable for the acts of his deputies or jailers. Id. at 338 (citing K.S.A. § 19-811). The Tenth Circuit ruled that "[t]his general language cannot be reasonably construed as a waiver of Kansas's immunity against § 1983 prisoner claims in the federal courts." Id. It concluded that because plaintiff had requested only monetary damages, sovereign immunity barred his claim against a sheriff's officer in his official capacity. See id. Before Hunter, cases from this district had come to the opposite conclusion on this question. See Schroeder, 311 F.Supp.2d at 1250, n.23 (no Tenth Circuit cases hold that county sheriff is state official); cf. Fugate v. Unified Gov't Of Wyandotte County/Kansas City, Kan., 161 F.Supp.2d 1261, 1266 (D. Kan. 2001) (county sheriff's department is agency of county).

Plaintiff persuasively argues that Hunter is not binding because it is an unpublished opinion and contains virtually no analysis. See Response Of Plaintiff Francisco Reyes To Court's Show Cause Order On Eleventh Amendment Immunity (Doc. #61) filed June 27, 2008 at 6-8; see Rule 32.1, 10th Cir. R. App. P (unpublished decisions not binding precedent but "may be cited for their persuasive value"). The Court notes that whether a Kansas sheriff is entitled to Eleventh Amendment immunity is a close question, as reflected by cases which avoid the question or reach varying results. Further, with all respect to the Tenth Circuit, Hunter is not necessarily persuasive because it did not address the relevant four-factor analysis under Steadfast Ins. Co. v. Agric. Co., 507 F.3d 1250, 1252-53 (10th

(continued...)

To determine whether Sheriff Steed is an arm of the State, the Court must conduct a four-factor inquiry, taking into account (1) how the entity is characterized under state law; (2) the entity's degree of autonomy; (3) the sources of the entity's operating funds; and (4) whether the entity deals primarily with local or state concerns.  Steadfast Ins. Co. v. Agric. Co., 507 F.3d 1250, 1252-53 (10th Cir. 2007); see Ambus, 975 F.2d at 1561-62.  In McMillan v. Monroe County, 520 U.S. 781 (1997), the Supreme Court applied a similar four-part test to determine whether a sheriff is a state or county policymaker for purposes of Section 1983 municipal liability.[11]  The Supreme Court stressed that the question is not whether the sheriff acts for the state or the county in some categorical, "all or nothing" manner, but rather whether the sheriff acted for the state in a particular area, or on a particular issue.  Id. at 785. Here, the inquiry focuses on whether Sheriff Steed represented the State or the county when he determined policy for identifying and detaining prisoners on warrants issued from Sedgwick County.

As for the first factor, how state law characterizes the sheriff, plaintiff cites Kansas cases and statutes which indicate that sheriffs are county rather than state officials.  Indeed, K.S.A. § 25-101 lists

---

[10](...continued)
Cir. 2007).

[11]     In McMillan the Supreme Court found that under Alabama law, the sheriff was a law enforcement policymaker for the State of Alabama, not the county.  520 U.S. at 793.  McMillan set out a four part test similar to that which the Tenth Circuit applies to the Eleventh Amendment inquiry: (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) the source of the entity's funds; and (4) who bears financial responsibility for judgments entered against the entity.  Id. at 787-792.  While the "policymaker" question is a statutory one governed by Section 1983, the arm-of-the-state analysis flows from Eleven Amendment principles.  Will v. Michigan Dep't of State Police, 491 U.S. 66-67 (1989).  The Supreme Court has recognized that these are separate inquiries but "in deciphering congressional intent as to the scope of § 1983, the scope of the Eleventh Amendment is a consideration, and we decline to adopt a reading of § 1983 that disregards it."  Id.

positions which are historically considered "county offices," including the county sheriff.[12]   See <u>Wall</u> <u>v. Harrison</u>, 201 Kan. 600, 603-04 (1968).  The county has authority to establish a jail, K.S.A. § 19-1901, and the sheriff has charge and custody of the jail of his county, <u>see</u> K.S.A. § 19-811.  If a county has no sheriff, the county clerk performs the statutory duties of the office.[13]   <u>See</u> K.S.A. § 19-804a.

As for the second factor, the degree of the sheriff's autonomy from the State, the Kansas Supreme Court in <u>Nielander</u> noted that county sheriffs enjoy autonomy in personnel decisions within their departments, and the sheriff has charge of the county jail.  <u>See</u> 275 Kan. at 263; K.S.A. § 19-811.  Defendant points out that the Kansas Attorney General (and the county attorney) may initiate an action to oust a sheriff for failure to perform law enforcement functions.  <u>See</u> K.S.A. §§ 8-605 and 60-1202.  Further, the sheriff must accept and take possession of prisoners committed by a judge of any city or county.  <u>See</u> K.S.A. §§ 19-1916, 19-1930; <u>see</u> <u>also</u> K.S.A. § 19-1917 (sheriff required to jail fugitives from another state or territory).  Kansas courts across the state may direct sheriffs to issue process and writs, bring prisoners before them and incarcerate individuals.  <u>See</u>, <u>e.g.</u>, K.S.A. § 19-812 (sheriff to serve and execute all lawful process, writs, precepts and orders); K.S.A. § 20-107 (sheriff to issue Kansas Supreme Court process and writs); K.S.A. § 20-363(a) (sheriff to serve process for district courts); K.S.A. § 22-3427 (sheriff to confine prisoners); K.S.A. § 43-166 (sheriff to serve jury summons).  On balance, however, it appears that in setting policy for the county jail and – in particular – setting policy for identifying and detaining prisoners on warrants from Sedgwick County, the sheriff

---

[12]     By contrast, the statute which creates the position of district attorney states that the district attorney "in no event . . . shall be deemed an officer of any county."  K.S.A. § 22a-101(a).  The legislature has attached no similar declaration to the office of county sheriff.

[13]     If a county sheriff were an arm of the state, a state official would  presumably act as the surrogate.

of Sedgwick County enjoys significant autonomy from state control.

The third factor, the source of the sheriff's operating funds, clearly supports a finding that the sheriff is not an arm of the State.  By statute, the board of county commissioners must approve the sheriff's annual budget, and the county – not the State – provides operating funds for the sheriff.  See K.S.A. § 19-805(a), (b), (c).  Also, the sheriff may collect revenue for the county for housing the prisoners of municipalities.  K.S.A. § 19-1930.

As for the fourth factor, whether the sheriff deals primarily with local or state concerns, Kansas statutes authorize sheriffs and their deputies to conduct law enforcement activities within their counties; they may act elsewhere in the state only in fresh pursuit of a suspect or if another agency requests assistance.  See K.S.A. § 22-2401a(1).  By contrast, Kansas Bureau of Investigation agents and Kansas Highway Patrol troopers exercise law enforcement powers anywhere in the State.  The geographical limitation on a county sheriff's law enforcement powers suggests that the office is local in nature.  See Eames v. Bd of County Comm'rs of Phillips County, 733 F.Supp. 322, 324 (D. Kan. 1990) (sheriff and deputies are employees of county they serve).  As noted, the sheriff must accept into the county jail prisoners from other counties and states.  Such prisoners are not local concerns, but for purposes of operating the jail and setting policy for identifying and detaining prisoners on warrants from Sedgwick County, it appears that the sheriff primarily deals with local concerns.

Based on the foregoing four factors, the Court finds that for purposes of setting policy for identifying and detaining prisoners on warrants from Sedgwick County, the sheriff acts as an arm of the county, and not the State.[14]  As such, he is not entitled to Eleventh Amendment immunity.  Cf. Nielander, 275 Kan. at 261 (position of sheriff coextensive with county board; each functions as local

---

[14]    For these same reasons, the Court finds as a matter of law that Sheriff Steed is an ultimate county decision-maker with regard to such policy.

political entity established through enabling legislation with neither being subordinate to other).  Id.

To the extent that Sheriff Steed is considered an officer of Sedgwick County, plaintiff's official capacity claim against him is actually a claim against Sedgwick County.  See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 n.55 (1978) (official capacity suits simply another way of pleading action against entity of which officer is agent).  The Court therefore treats the claim as one against Sedgwick County, and it need not further address the question of Eleventh Amendment immunity.

B.     Plaintiff's Section 1983 Claim Against The County

Municipal liability under Section 1983 does not automatically spring from the acts of municipal employees, Pembaur v. City of Cincinnati, 475 U.S. 469, 478(1986), but results when the municipality itself causes the wrong.  Such wrongs may arise from official policy, e.g. "acts which the [county] has officially sanctioned or ordered," or from the act of an ultimate county decision-maker.  Pembaur, 475 U.S. at 479-80.  To create liability against a local governmental body under Section 1983, plaintiff must show (1) a constitutional violation and (2) an official policy or custom which was the moving force behind the violation.  City of Oklahoma City v. Tuttle, 471 U.S. 808, 820(1985)).  The challenged policy or custom need not be formal or written, Watson v. City of Kansas City, 857 F.2d 690, 695 (10th Cir. 1988), but plaintiff must establish a direct causal link between the government action and the deprivation of federal rights.  Bd. of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997) (must demonstrate that unconstitutional actions resulted from policy or custom adopted or maintained with deliberate indifference to constitutional rights).

The Board asserts that it is entitled to summary judgment because plaintiff does not have the right to a post-arrest investigation under the Fourth Amendment or the substantive due process guarantees of the Fourteenth Amendment.  The Board also argues that even if plaintiff had such rights,

he has not raised a genuine issue of material fact whether the County violated those rights.  See Myers v. Oklahoma County Bd. of County Comm'rs, 151 F.3d 1313, 1316-17 (10th Cir. 1998) (regardless of governmental policies, no liability where officers inflict no constitutional harm); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978) (to establish cause of action under Section 1983, plaintiff must prove deprivation of federal right).

    1.    Constitutional Violation

    As a preliminary matter, the Court notes that the law is not clear as to the appropriate constitutional provision under which plaintiff's Section 1983 claims are properly analyzed.  Cf. Becker v. Kroll, 494 F.3d 904, 913 (10th Cir. 2007) (case required court to "wade into murky waters" of Section 1983 malicious prosecution claims).[15]  Plaintiff's constitutional claims are predicated on factual

---

    [15]    Section 1983 provides a civil cause of action against state officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983.  Section 1983 claims are often analytically similar to – although distinct from – common law torts such as false arrest or malicious prosecution.  See id. (malicious prosecution); Smith v. Plati, 258 F.3d 1167, 1174 (10th Cir. 2001) (false arrest).  Courts therefore use the common law of torts as a starting point for determining the contours of constitutional claims under Section 1983.  See Pierce v. Gilchrist, 359 F.3d 1279, 1286 (10th Cir. 2004); Becker, 494 F.3d at 913-14 (not all Section 1983 actions have common law analog, and no Section 1983 action depends entirely on a common law analog to define its elements).

    In the context of false arrest and false imprisonment, the Tenth Circuit has ruled that to establish a constitutional violation, plaintiff must do more than allege a state law claim of false arrest; plaintiff must establish what the Tenth Circuit sometimes terms a *substantive due process* claim.  See Smith, 258 F.3d at 1174-75 (under state common law, slightest interference with personal liberty is false imprisonment but not all such invasions activate remedies under due process clause of Fourteenth Amendment).  On the other hand, the Tenth Circuit has stated that Fourteenth Amendment substantive due process standards "have no applicability" to a claim of wrongful pretrial detention.  See Taylor v. Meacham, 82 F.3d 1556, 1559-60 (10th Cir. 1996) (unclear how far Fourth Amendment protection against unreasonable seizures can reach in pretrial context but "seizure" issue fairly straightforward where plaintiff remained in detention and was effectively seized throughout time period in question); see also Albright v. Oliver, 510 U.S. 266 (1994) (Fourth Amendment governs pretrial deprivations of liberty because where particular amendment provides explicit textual source of constitutional protection against particular government behavior, that amendment – not more generalized notion of

(continued...)

argument that defendants detained him for two weeks on an arrest warrant for another man.  In Romero v. Fay, 45 F.3d 1472, 1480 (10th Cir. 1995), the Tenth Circuit invoked the Fourteenth Amendment in analyzing a Section 1983 claim that defendants denied plaintiff the right to a reasonable post-arrest investigation after they arrested and detained him, without a warrant, based on mistaken identity.[16] Although Romero involved a warrantless arrest, and plaintiff here was arrested on a warrant, officers in both cases had probable cause for the arrest.  Romero thus suggests that plaintiff's claim of unlawful pretrial detention is within the ambit of the Fourteenth Amendment and is not properly analyzed under the Fourth Amendment.[17]

On the other hand, in Baker v. McCollan, 443 U.S. 137, 143 (1979), the Supreme Court dismissed a Fourteenth Amendment claim that defendants had intentionally failed to "investigate and determine that the wrong man was imprisoned."  Id.  In Baker, plaintiff's brother was masquerading as

---

[15](...continued)
substantive due process – must guide analysis); Becker, 494 F.3d at 919 (Fourth Amendment protects liberty interests by ensuring that arrest is reasonable; more general due process considerations of Fourteenth Amendment not fallback to protect interests more specifically addressed by Fourth Amendment).  Further, the Tenth Circuit has stated that an "initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause."  Pierce, 359 F.3d at 1285-86 (plaintiff imprisoned without legal process has claim under Fourth Amendment analogous to tort claim for false arrest or false imprisonment; if imprisoned due to wrongful process, plaintiff has claim under Fourteenth Amendment due process clause analogous to tort claim for malicious prosecution).

[16]      In Romero, plaintiff also asserted that police arrested him without probable cause in violation of his Fourth Amendment rights.  See Romero, 45 F.3d at 1474.  The district court found that defendants were not entitled to qualified immunity because they had arrested plaintiff without probable cause.  Id. at 1474-75.  The Tenth Circuit reversed, finding that plaintiff had not set forth facts to show an arrest without probable cause.  Id. at 1477-78.

[17]      To further complicate the analysis, many of the relevant cases refer generally to a "Fourteenth Amendment right" without explicitly identifying the right to which they refer: an incorporated Fourth Amendment right, a substantive due process right and/or a procedural due process right.

plaintiff and a judge issued an arrest warrant for the brother in plaintiff's name.  Police arrested plaintiff,

despite his protests of mistaken identity, and held him for three days before they discovered that he was

the wrong person.  Plaintiff claimed that the county sheriff had denied him rights pursuant to the

Fourteenth Amendment.  Id. at 141.  The Supreme Court disagreed, holding that the plaintiff had not

established the deprivation of a constitutional right.  Because plaintiff focused exclusively on his

prolonged detention without adequate identification procedures, the Supreme Court presumed that

plaintiff asserted a violation of Fourteenth Amendment protections against deprivations of liberty

without due process of law.[18]  Id.  The Supreme Court held that as a matter of law, plaintiff's

confinement for three days in the county jail did not deny him liberty without due process.  It reasoned

as follows:

> The Fourteenth Amendment does not protect against all deprivations of liberty.  It
> protects only against deprivations of liberty accomplished "without due process of law."
> A reasonable division of functions between law enforcement officers, committing
> magistrates, and judicial officers – all of whom may be potential defendants in a § 1983
> action – is entirely consistent with "due process of law."  Given the requirements that
> arrest be made only on probable cause and that one detained be accorded a speedy trial,
> we do not think a sheriff executing an arrest warrant is required by the Constitution to
> investigate independently every claim of innocence, whether the claim is based on
> mistaken identity or a defense such as lack of requisite intent.  Nor is the official charged
> with maintaining custody of the accused named in the warrant required by the
> Constitution to perform an error-free investigation of such a claim.  The ultimate
> determination of such claims of innocence is placed in the hands of the judge and the
> jury.

443 U.S. at 145-46.  In dicta, however, the Supreme Court observed that "[o]bviously, one in

respondent's position could not be detained indefinitely in the face of repeated protests of innocence

even though the warrant under which he was arrested and detained met the standards of the Fourth

---

[18]       The Supreme Court noted that plaintiff did not claim that the initial arrest was
constitutionally deficient and that, in any event, the arrest did not violate the Fourth Amendment
because it was pursuant to a "facially valid warrant."  Baker, 443 U.S. at 144.

Amendment." 443 U.S. at 144.

The scenario which Baker anticipated in dicta came before the Tenth Circuit in Romero, which involved protracted detention and repeated protests of innocence sufficient to invoke a Fourteenth Amendment – rather than a Fourth Amendment – analysis. In Romero, an officer arrested Romero based on interviews with two women who implicated him in a homicide. 45 F.3d at 1474. Romero repeatedly professed his innocence and named witnesses who could exonerate him. The officer refused to interview any of the witnesses, however, and defendants held Romero for three months before they asked prosecutors asked to dismiss the charge. Id. Romero filed a Section 1983 action alleging violations of his Fourteenth Amendment rights.[19] Id. Specifically, he contended that defendants violated his federal constitutional rights by conducting an unreasonable post-arrest investigation and falsely imprisoning him for three months when he repeatedly protested his innocence. The Tenth Circuit disagreed, holding that plaintiff had not alleged a constitutional violation. The Tenth Circuit noted that a police officer does not violate the Fourteenth Amendment merely by arresting an individual who happens to be innocent. Id. at 1480 (citing Baker, 443 U.S. at 145) (Constitution does not guarantee that only guilty will be arrested); See also Edwards v. Baer, 863 F.2d 606, 607 (8th Cir. 1988) (mere fact of invalid arrest does not ordinarily convert common law tort of false arrest or false imprisonment to violation of constitutional right). Instead, to state a claim for violation of Section 1983, plaintiff must

---

[19]     As noted supra, plaintiff also asserted that police arrested him without probable cause in violation of his Fourth Amendment rights. See Romero, 45 F.3d at 1474. The district court found that defendants had arrested plaintiff without probable cause and were not entitled to qualified immunity. Id. at 1474-75. The Tenth Circuit reversed, finding that plaintiff had not set forth facts to show an arrest without probable cause. Id. at 1477-78. In challenging his three-month detention after the arrest, Romero framed the constitutional issue as one arising under the Fourteenth Amendment, rather than the Fourth Amendment. The Tenth Circuit did not expressly repudiate the Fourth Amendment as the proper frame of reference, but it followed plaintiff's argument in analyzing his claims under the Fourteenth Amendment.

specifically allege that the government official acted with deliberate or reckless intent to falsely imprison him.  Romero, 45 F.3d at 1480.  The Tenth Circuit found that at most plaintiff had shown negligent conduct, not deliberate or reckless intent to falsely imprison him.[20]  Id. at 1481.[21]

_____

[20]     Plaintiff relies heavily on cases from other circuits which conclude that officers act unconstitutionally when they refuse to investigate or release a person who has been wrongfully arrested on a warrant which names someone else.  See, e.g., Fairley v. Luman, 281 F.3d 913, 918 & n.6 (9th Cir. 2002) (Fourteenth Amendment procedural due process violation where jail held plaintiff for 12 days on warrants for identical twin; plaintiff repeatedly protested detention and told booking officer he had twin; Lee v. City of Los Angeles, 250 F.3d 668 (9th Cir. 2001) (two-year detention of obviously mentally disabled man who shared no physical characteristics with person named on warrant violated Fourth Amendment and Fourteenth Amendment due process clause); Cannon v. Macon County, 1 F.3d 1558 (11th Cir. 1993) (three-month detention on warrant for woman with different social security number and date of birth, and who had significant physical differences from fugitive and repeatedly protested detention, violated substantive due process under Fourteenth Amendment), modified on rehearing on other grounds, 15 F.3d 1022 (1994); see also Atkins v. City of Chicago, 441 F. Supp.2d 921 (N.D. Ill. 2006) (37-day detention of plaintiff who repeatedly protested detention, whose information differed from suspect's in most respects except for name, and who never appeared before judge violated Fourteenth Amendment).  In these cases, however, defendants provided inadequate procedures to address the identification and detained plaintiffs for lengthy periods despite repeated protests of innocence; furthermore, at the minimum, the courts required proof of deliberate indifference to establish a constitutional violation.

    In Reyes v. Board of County Commissioners of Arapahoe County – a case which addressed this plaintiff's detention in Arapahoe County, Colorado – the United States District Court for the District of Colorado distinguished Farley, Lee and Cannon, as follows:

>   These cases in general involve repeated protestations by the arrestee, significant differences between the wanted fugitive's and the arrestee's identifying information, extended detentions and/or other extraordinary circumstances not present here (e.g. mental disability, knowing concealment).  In contrast, the circumstances here present at most negligence, in that the officers could have discovered that Plaintiff was not the wanted fugitive if they had taken further investigative steps.  All the cited cases, taken together, show that a wilful refusal to verify a repeated claim of mistaken identity over an extended period of time could support a claim, but none stand for the proposition that the mere failure to discover the error is a constitutional violation in circumstances where the arrestee matches the fugitive in many respects and has the ability and opportunity, including a court hearing, to bring the mistake to light but does not.

No. 06-2319, 2008 WL 961565 at *5 (D. Colo. Apr. 8, 2008); see also Rudkin v. Sedgwick County, 469 F. Supp.2d 953, 959 (D. Kan. 2007) (right to be free from pre-trial detention absent probable cause

(continued...)

In cases which allege deprivation of rights by post-arrest detention, at least two circuits have analyzed the claims under the Fourth Amendment.  In Lee v. City of Los Angeles, supra, Kerry Sanders alleged that defendants violated his Fourth and Fourteenth Amendment rights when they arrested him on a warrant for Robert Sanders and held him for two years without a hearing.  The district court dismissed both constitutional claims under Rule 12(b)(6).  The Ninth Circuit reversed, finding that plaintiff stated both a Fourth and a Fourteenth Amendment claim.  As to the Fourth Amendment claim, defendants lacked probable cause to arrest plaintiff because no reasonable police officer could have believed that Kerry Sanders was the same person as Robert Sanders.  Lee, 250 F.3d at 684.  Moreover, defendants "recklessly and with deliberate indifference" to plaintiff's constitutional rights failed to check fingerprints and other characteristics and compare them to those of Robert Sanders.  See id. at 668.  As for the Fourteenth Amendment claim, the Ninth Circuit relied upon dicta from Baker that

---

[20](...continued)
not among substantive due process rights).

[21]     Citing Baker, 443 U.S. at 145-46, the Tenth Circuit noted that defendants had no obligation to release plaintiff merely because he said he was innocent.  It stated that "the Supreme Court's observations in Baker regarding claims of innocence after an arrest supported by an arrest warrant apply by analogy to claims of innocence after a warrantless arrest."  Romero, 45 F.3d at 1480.

Defendant asserts that Romero is analogous because Colorado authorities had probable cause for plaintiff's arrest and Sedgwick County jail staff had no obligation to continue an investigation after that arrest.  Plaintiff contends that Romero is distinguishable because it involved a warrantless arrest, and he was arrested on a warrant issued for someone else.  As in Romero and Baker, however, this case involves the detention of an innocent person arrested with probable cause, and the Court finds no basis on which to distinguish it.  See also Scull v. State of New Mexico, 236 F.3d 588, 598 (10th Cir. 2000) (where plaintiff arrested on facially valid warrant, jailers have no constitutional duty to independently investigate claims of innocence); Rudkin, 469 F. Supp.2d at 956-57 (person detained as result of mistaken identity suffers no violation of substantive due process rights); Echols v. Unified Gov't of Wyandotte County, 399 F. Supp.2d 1201 (D. Kan. 2005) (no Fourth Amendment duty to investigate detainee's claim of innocence if he was arrested on facially valid warrant); cf. Brady v. Dill, 1897 F.3d 104, 155 n.10 (1st Cir. 1999) (suggesting in dicta that if police were to mis-execute warrant, i.e. arrest someone other than person named in warrant because of mistaken identities, different case would arise).

depending on what procedures the state afforded defendants following arrest and prior to trial, detention pursuant to a valid warrant "after the lapse of a certain amount time" gives rise to a due process claim under the Fourteenth Amendment.  See id. at 683 (quoting Baker, 443 U.S. at 145).

In Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007), the Second Circuit found that an officer violated plaintiff's Fourth Amendment rights by withholding and concealing exculpatory evidence that plaintiff, who had been arrested pursuant to valid warrant, was not the person who committed the crime.  The Second Circuit found that while plaintiff remained incarcerated for 217 days, police violated a duty "to investigate specific, readily-verifiable claims of innocence in a reasonable time period" by intentionally failing to view a videotape which conclusively exonerated plaintiff.  Id. at 209.  Although plaintiff alleged violation of a substantive due process right under the Fourteenth Amendment, the Second Circuit found that the right should be analyzed under the Fourth Amendment, see Graham v. Connor, 490 U.S. 386 (1989), because it provided an explicit textual source of constitutional protection against the particular sort of government behavior involved in that case.  Russo, 479 F.3d at 208.  More specifically, the Second Circuit found that when an accused is physically detained following arraignment, he has been seized within the meaning of the Fourth Amendment.  See id. (citing County of Sacramento v. Lewis, 523 U.S. 833, 844 (1998) (Fourth Amendment seizure occurs when government terminates freedom of movement through means intentionally applied); Albright, 510 U.S. at 274 (Fourth Amendment addresses pretrial deprivations of liberty).  Citing the length of time of wrongful incarceration, the ease with which officers could have checked the exculpatory evidence and the alleged intentionality of their behavior, the Second Circuit determined that plaintiff had sufficiently alleged an unreasonable seizure, i.e. an intentional violation of – or deliberate indifference to – his constitutional rights.  Russo, 475 F.3d at 209.  The Second Circuit concluded that the evidence of shocking conduct on the part of the officers was sufficient to preclude a grant of summary judgment

in their favor on plaintiff's unreasonable seizure claim.

Bearing these cases in mind, the Court now addresses whether plaintiff has set forth evidence that the County violated his constitutional rights under the Fourth or Fourteenth Amendment.

a.      Fourth Amendment

Plaintiff claims that by detaining him in the Sedgwick County jail for two weeks on a warrant for another man, the County (through Sheriff Steed in his official capacity) violated his Fourth Amendment right to be free from unreasonable seizures.  The County asserts that it is entitled to summary judgment because (1) plaintiff had no Fourth Amendment right to a post-arrest investigation; (2) if he had such a right, plaintiff has not shown that any defendant violated it and (3) plaintiff cannot show that county policy or custom caused the violation.

As noted, plaintiff asserts that the custom or policy of the Sheriff's Department violated his rights under the Fourth Amendment.  In other words, plaintiff asserts that defendant is liable because the custom or policy of the Sheriff's Department was the driving force behind the constitutional violation, i.e. that jail personnel implemented a policy or custom of detaining persons arrested on warrants without investigating claims of mistaken identity, and that the execution of this policy or custom inflicted the injuries of which he complains.  A local governing body may be directly liable under Section 1983 where the unconstitutional action implements a policy of the government entity. See Garcia v. Salt Lake County, 768 F.2d 303, 307 (10th Cir. 1985) (when execution of governmental policy or custom inflicts injury, government as entity is responsible under Section 1983).

Although the general standard for a Fourth Amendment violation is reasonableness, the Tenth Circuit and other courts have found that to establish a Section 1983 claim for false arrest, plaintiff must show that defendant acted with deliberate or reckless intent to falsely imprison him.  See Romero, 45 F.3d at 1478, 1480-81 (negligent failure to conduct post-arrest investigation did not render arrest

unreasonable); <u>Russo</u>, 479 F.3d at 209-210 (requiring intentional violation or deliberate indifference

which "shocks the conscience" as crucial feature going to unreasonableness of the seizure);[22] <u>see also</u>

<u>Lee</u>, 250 F.3d at 684 (applying "recklessly and with deliberate indifference standard" to unreasonable

seizure claim).  Under this standard, plaintiff has not shown that the County violated his Fourth

Amendment rights.

     Plaintiff asserts that Sheriff Department employees acted with deliberate indifference to "a very

real, very tangible likelihood" that he was not the wanted man and that their failure to conduct a

fingerprint comparison evinces a patent disregard of his Fourth Amendment rights.  To succeed on his

theory of liability, however, plaintiff must show that the employees' conduct was pursuant to municipal

---

     [22]    The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment protects the privacy and security of individuals against arbitrary invasions by the government. <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 335 (1985). For purposes of the Fourth Amendment, a seizure is unconstitutional if it is unreasonable. A seizure is reasonable if it is justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place. <u>Edwards ex rel. Edwards v. Rees</u>, 883 F.2d 882, 884 (10th Cir. 1989) (citing <u>T.L.O.</u>, 469 U.S. at 341).

     Courts have found that an arrest on a warrant for another may be reasonable. <u>See</u> <u>Hill v. Scott</u>, 349 F.3d 1068, 1072-1073 (8th Cir. 2003) (given remarkably similar descriptions of two Brian Hills, officers reasonably mistook one for other in executing warrant; not unreasonable to fail to check date of birth); <u>Rodriguez v. Farrell</u>, 280 F.3d 1341, 1348 (11th Cir. 2002) (no Fourth Amendment violation where police arrested on warrant person with same name, sex, age, state of birth and race and similar social security number, notwithstanding four-inch discrepancy in height); <u>United States v. Marshall</u>, 79 F.3d 68, 69 (7th Cir. 1996) (arrest pursuant to warrant for Raymond Beasley reasonable, given defendant's resemblance to Beasley and fact that woman who claimed to know Beasley identified his photograph then identified defendant); <u>White v. Olig</u>, 56 F.3d 817, 820-21 (7th Cir. 1995) (person arrested had same name, race, county of residence, birth date and approximate weight as person named in warrant and indicated that he knew what warrant was about); <u>United States v. McEachern</u>, 675 F.2d 618, 622 (4th Cir. 1982) (arrest of defendant pursuant to arrest warrant for brother lawful where police had reasonable but mistaken belief defendant was subject of warrant).

policy, and that the *policy* was deliberately indifferent to the risk of a constitutional violation.  See

Garcia, 768 F.2d at 309.   As noted, the Sheriff's Department has written policies pertaining to

identification of detainees.   Those policies include (1) "[i]f there is any doubt about the identity of a

person, conflicting data, or insufficient information on the Journal Entry, the Booking Sergeant will be

contacted" and   (2) "when an inmate's identity is not 'immediately verifiable,' he or she may be

accepted under the name of "John or Jane Doe" and the Records Section will be notified and a set of

fingerprints will be taken to make a positive identification."   Further, unwritten policy requires

reasonable measures to verify that the correct person is in custody, such as checking pictures or

mugshots.  Although the jail employees apparently did not follow these policies, operational error does

not support municipal liability.  See Monell, 436 U.S. at 691.  It bears noting that plaintiff waived

extradition to Kansas and at his extradition hearing never mentioned that he was not the person named

in the warrant.  Further, at his first appearance within 24 hours after he arrived at the Sedgwick County

jail, plaintiff did not tell the judge that he was not the man named on the warrant.[23]  Even viewing the

record in a light most favorable to plaintiff, the record does not reveal a genuine issue of material fact

whether defendant's policy (as opposed to operational error or plaintiff's failure to effectively

communicate his claim of mistaken identity) was the driving force behind plaintiff's detention.  As a

result, plaintiff has not shown a violation of his Fourth Amendment rights.[24]

_____

[23]      The Supreme Court has found that the Fourth Amendment allows police up to 48 hours to take a suspect to court.  See County of Riverside v. McLaghlin, 500 U.S. 44 (1991).  Here, defendant took plaintiff to court within 24 hours.

[24]      In his complaint, plaintiff specifically alleges a failure to train.  Also, in opposition to defendants' motion for summary judgment, plaintiff argues that defendant is liable for failure to train.  The pretrial order does not set forth a Section 1983 theory of failure to train, however, and the Court therefore finds that plaintiff has waived such a claim.

b.      Fourteenth Amendment Substantive Due Process

The Court next addresses plaintiff's claim that the County's failure to conduct a post-arrest investigation violated his Fourteenth Amendment right to substantive due process. <u>Baker</u> rejected a similar claim, holding that the separation of roles precluded any liability against the police officers because the "ultimate determination of claims of innocence" is "in the hands of the judge and the jury." 443 U.S. at 146.  This distinction is critical, as <u>Baker</u> acknowledged that a "reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers" is "entirely consistent with due process of law." <u>Id.</u> at 145.  Respect for the separation of functions explains why <u>Baker</u> declined to impose on police officers an affirmative duty to investigate claims of innocence and why post-arrest due process guarantees are generally sufficient to protect plaintiff's rights. <u>Brady</u>, 187 F.3d at 11 (citing <u>Baker</u>, 443 U.S. at 145-46).

In <u>Baker</u>, however, the Supreme Court anticipated the "unusual situation" where plaintiff might have a substantive due process claim based on a post-arrest detention.  In doing so, it considered (1) the extent of plaintiff's protests, (2) the time elapsed and (3) whether plaintiff received due process procedures. <u>See</u> 443 U.S. at 144-45.  Here, plaintiff protested on only two occasions (during booking and in his written inmate request), far fewer times than in <u>Baker</u>.  Plaintiff spent 15 days in the county jail – considerably longer than the three days in <u>Baker</u>, but shorter than in many cases which have found no substantive due process violation. <u>See</u> <u>Romero</u>, 45 F.3d at 1474 (three months); <u>Echols</u>, 399 F. Supp. 2d 1201, 1202 (D. Kan. 2005) (25 days); <u>Scull</u>, 236 F.3d at 592 (30 days).  Before he arrived at the jail, plaintiff appeared at a hearing and waived extradition without mentioning mistaken identity to either the court or the public defender.  Further, within 24 hours of his transfer to Sedgwick County, plaintiff made his first appearance in state district court, where he again failed to mention mistaken identity. Finally, when plaintiff's lawyers explained the mistaken identity to the prosecutor, the Sheriff's

-28-

Department immediately released him.  Given the extent of plaintiff's protests, the length of time and the due process procedures which plaintiff received, the Court finds as a matter of law that plaintiff has not demonstrated a genuine issue of material fact whether defendant violated his substantive due process rights.

## II.     State Law Claims

Plaintiff has also asserted state law claims for false arrest/false imprisonment and negligence. The Court's subject matter jurisdiction over these claims is predicated on supplemental jurisdiction under 28 U.S.C. § 1367(a).  Plaintiff does not assert diversity of citizenship.  Because the Court has granted summary judgment on plaintiff's federal claim, the Court will determine whether to exercise its supplemental jurisdiction over the remaining state law claims.

The district court may decline to exercise supplemental jurisdiction over a state law claim if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3).  It is within the sound discretion of the district court to exercise supplemental jurisdiction.  Medina v. City of Osawatomie, 992 F.Supp. 1269, 1279 (D. Kan. 1998).  In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims. McWilliams v. Jefferson County, 463 F.3d 1113, 1118 (10th Cir. 2006) (quoting Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

The Court finds no compelling reasons to exercise supplemental jurisdiction to decide the merits of plaintiff's state law claims.  See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990) (notions of comity and federalism demand that state court try its own lawsuits, absent compelling reasons to contrary).  In the interest of comity and federalism, the Court dismisses plaintiff's

state law claims for false imprisonment and negligence.

**IT IS THEREFORE ORDERED** that <u>Defendants' Motion For Summary Judgment</u> (Doc. #33) filed March 13, 2008 be and hereby is **SUSTAINED as to plaintiff's claims under Section 1983.**

**IT IS FURTHER ORDERED that the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims.  Plaintiff's state law claims for false imprisonment and negligence are hereby DISMISSED without prejudice.**

Dated this 3rd day of July, 2008 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
Kathryn H. Vratil
United States District Judge